Rogers v. Hosack's Executors.

---

[319]     ROGERS, *appellant,* and HOSACK'S EXECUTORS, *respondents.*

A *covenant* by a debtor to pay certain debts owing by him out of a designated fund when the same shall be received by him, cannot be construed into an *equitable mortgage* of the fund, so as to give the creditors a *specific lien* thereon; such covenant is merely *personal.*

The release of a *joint debtor* with the *consent of his co-debtor* does not discharge the debt.

An *abandonment* rightfully made of a vessel lost at sea by capture, transfers as well the *spes recuperandi* as the interest of the assured in the vessel lost, although the loss has not been *actually paid* by the insurer.

Moneys obtained from a foreign government by treaty, in satisfaction for property of a testator illegally captured on the high seas, are in the hands of an *executor* legal, and not merely equitable assets.

An *executor,* a creditor of his testator, previous to the Revised Statutes going into effect, had a preference over other creditors whose claims were not of a superior dignity to his own, and might, accordingly, from the assets of the estate, *retain* the amount due to him.

The *statute of limitations* cannot be interposed in bar of the exercise of such right of retainer.

An appeal does not lie for a mere error in figures in carrying out a principle of apportionment in the distribution of funds among creditors; the remedy is by motion or by bill of review.

Nor does an appeal lie from an order or decree in chancery refusing to displace an executor and to appoint a receiver in his stead. A question resting in discretion in the court below, cannot be reviewed by appeal.

A decree will not be reversed merely because an injunction is dissolved previous to the coming in of the answers of *all* the defendants, where there are several defendants in a cause.

APPEAL from chancery. On 27th April, 1824, A. Gracie, C. King and W. Gracie, (constituting the firm of Archibald Gracie & Sons,) executed an assignment to C. Wilkes and J. Goodhue, of the city of New-York, whereby, after reciting that they were indebted to certain persons named in a schedule annexed to the assignment, in the amount set opposite to their respective names, which debts they alleged they were then unable to pay, but were willing to provide for the payment and security thereof; and after also reciting that they (the assignors) were justly and legally entitled to claim from the *government of Great*
[320] *Britain* restitution for losses sustained by them on account of the illegal and unjust seizure, capture, and detention of certain vessels and cargoes the property of the assignors, by vessels of war belonging to the government of Great Britain, which claims were specified in a schedule also annexed, they assigned and transferred the said claims to Wilkes and Goodhue, to hold the same, and the proceeds and moneys that might be recovered thereon *in trust,* to pay and discharge the debts due and owing to the several creditors named in the schedule above referred to, *who should become parties to the assignment,* if there should be a sufficiency for that purpose; and if there should not be sufficient, then to pay the same ratably and proportionably. Next followed a *release* on the part of the creditors to *C. King and W. Gracie,* discharging them of and from all actions, causes of action, claims and demands whatsoever, by reason of any cause, matter or thing whatever. Then came a *covenant* on the part of Archibald Gracie, that if the amount of moneys to be received from the *British government* upon the claims assigned, should prove insufficient to pay the several debts mentioned in the schedule, " *that then and in that case such deficiency shall be made up and paid out of any moneys which shall or may be recovered and re-*

Rogers v. Hosack's Executors.

ceived by the said Archibald Gracie, his executors, administrators or assigns, of or from the FRENCH GOVERNMENT, for or on account of certain large claims and demands, which he, the said Archibald Gracie, now has on the said French government; and that such deficiency shall be paid out of said moneys when and as soon as the same shall be received by the said Archibald Gracie, his executors, administrators or assigns." A number of the creditors named in the schedule became parties to the assignment by affixing their names thereto, among whom were Nehemiah Rogers and his three sons, Samuel, Edward, and George, transacting business under the name of Nehemiah Rogers & Sons. Another of the creditors whose name appears subscribed to the assignment, is Alexander Hosack. During the lifetime of Archibald Gracie, the creditors named in the schedule received thirty-five per cent. upon the amount of their demands, as the proceeds of the claims upon the government of Great Britain. In April, 1829, Archibald Gracie died, leaving behind him a last will and testament, dated in 1817, whereby he appointed Nehemiah Rogers and two [321] other persons executors thereof. The claims of Archibald Gracie against the French government having been prosecuted, the commissioners of the government of the United States, acting under the treaty made with France on the subject of spoliations on our commerce, on the 18th May, 1836, issued certificates to Nehemiah Rodgers, as surviving executor of Archibald Gracie, allowing his claims to the amount of $120,893.20, on which he was entitled to receive about $73,000. In anticipation of the issuing of those certificates, a bill in chancery was prepared on the 17th May, 1836, to be filed by the executors of Alexander Hosack, one of the creditors named in the schedule annexed to the assignment of Archibald Gracie & Sons, praying that Rogers might be enjoined from receiving the money, awarded under the French treaty. In this bill the complainants, after setting forth the assignment executed by Gracie & Sons, stated that in 1824, a judgment was obtained by their testator against Gracie & Sons, for a sum exceeding $19,000; that the claims of Gracie on the French government had been presented by Nehemiah Rogers, and had been admitted and allowed to an amount exceeding $127,000; that doubts had arisen as to the distribution of the moneys to be received under such allowance, it being pretended by some persons interested in the fund that the creditors of Gracie had released their debts by becoming parties to the assignment, and were only entitled to claim under the covenant contained therein, and also that the debts were discharged by the effect of the statute of limitations, so that it had become difficult to settle the claims of the different parties without the aid of a court of equity. They further stated that Nehemiah Rogers was 81 years old, that he claimed to be a creditor of Archibald Gracie to an amount beyond the sum specified in the schedule annexed to the assignment, and that they believed from the involved and precarious state of his affairs that it was unsafe that he, as a trustee or executor, should receive the funds of the estate of Archibald Gracie for distribution; and in support of this opinion they stated a variety of facts in rela- [322] tion to the business and affairs of Nehemiah Rogers; and also stated that no account had been rendered by him in his character as executor. They prayed that he might be decreed to render an account; that he might be restrained by injunction from receiving the moneys allowed under the French treaty, or certificates for the same; and that a receiver might be appointed to take charge of all the outstanding assets of the estate of Archibald Gracie. An injunction was granted, but the complainants not being able to serve it upon Rogers, filed a supplemental bill stating that he had obtained possession of the certificates, and praying that he might be enjoined from parting with, negotiating, or in any way using the same. This injunction was granted and served. The complainants then presented a petition praying for an order that Rogers surrender the certificates to the clerk of the court of chancery, until a receiver should be appointed to receive the same and the moneys payable thereon. On the hearing of this petition, Rogers produced

affidavits to show both his ability to discharge the trusts confided to him, and his perfect solvency. The vice-chancellor, however, granted the prayer of the petition, directing the certificates to be delivered to the clerk, and a power of attorney to be executed authorizing the clerk to receive the moneys due thereon, and all other moneys and effects mentioned in the several bills filed by the complainants. In the original bill filed in this case, another matter alleged by the complainants to be connected with the *French claims*, was also stated; they set forth that Archibald Gracie, in his lifetime, obtained a judgment against the Commercial Insurance Company, on a policy of insurance, for the loss of a vessel illegally captured; that James B. Murray, the surviving trustee of that company, had presented a claim under the French treaty on account of such capture, which had been allowed, and that he was about to receive a certificate from the commissioners under this treaty to the amount of $20,000; that it was probable that Rogers would demand the same, and they therefore prayed, for the reasons before assigned, that Rogers might also be enjoined from receiving that sum; [323] which injunction was also allowed and issued. Previous to the order for the delivery of the certificates to the clerk, Rogers put in answers to the several bills, in which he alleged that Archibald Gracie was indebted to him in the sum of $42,464, which, *as executor*, he claimed the *right to retain*.

From the several decrees and orders made by the vice-chancellor, Rogers *appealed* to the chancellor, who decided that the assignment of the *French claims* created an *equitable lien* in favor of the creditors who came in under the assignment, so as to entitle them to a preference over the other creditors, and that consequently Rogers could *retain only to the extent of his proportionate share*, which the chancellor fixed at $13,172.02, and he modified the decree of the vice-chancellor accordingly. The chancellor also reversed the decree of the vice-chancellor, enjoining Rogers from receiving the money due from the insurance company; and also reversed the order directing the execution of an authority to the clerk of the court of chancery, to receive all moneys and effects belonging to the estate of Archibald Gracie, except such as were receivable under the certificates, and as to those, he modified the decree as above stated. In all other respects, the decree of the vice-chancellor was affirmed. See the opinion delivered by the chancellor, 6 *Paige's R.* 425, *et seq.*, where also will be found a more particular statement of the case between these parties, the arguments of counsel, and the authorities cited on the hearing before the chancellor. From the decree of the chancellor, both parties appealed to this court.

The case was argued in this court by

*A. G. Rogers & G. Griffin*, for Rogers.

*J. Blunt & D. Lord, jun.*, for Hosack's executors.

*Points insisted upon in behalf of the appellant, Nehemiah Rogers :*

I. The appellant having accepted the executorship of Archibald Gracie, and entered on the duties thereof *prior to the year* 1830, had a vested right to [324] retain for his debt out of any then present or future assets. (*Tol. on Ex.* 297. *Weeks v. Gore*, 3 *P. Wms. note. Waring v. Danvars*, 1 *P. Wms.* 295. *De Tastets v. Shaw*, 1 *Barn. & Ald.* 664. *Ram on Assets*, 271. *Tol. on Ex.* 415. *Nones v. Barlow*, 1 *Sim. & Stu.* 588.)

II. The covenant of Archibald Gracie in the assignment, dated 27th April, 1824, to pay out of his French claims the deficiency, if any, arising out of the assignment of the English claims thereby assigned, was not an equitable assignment or mortgage of said French claims, so as to give the creditors a specific lien thereon, that covenant being a personal covenant merely. *Bradley v. ——, Ridg. Ch. Cas.* 194. *Ex parte Haywood*, 2 *Rose's R.* 355. *Williams v. Everett*, 14 *East*, 582. *Clayton v. Fawcett*, 2 *Leigh*, 19. *Brainard v. Barton*, 5 *Verm. R.* 97.) To the point of the covenant being a *several* and not a *joint* covenant, see 5 *Dowl. & Ryl.* 106; 3 *Barn. & Cres.* 254; 5 *Price*, 529; 1 *Saund.* 153, *n.* 1; *Chitty's Pl.*, ed. of 1825, *p.* 3, 6, *and cases there cited; Servante v*

Rogers v. Hosack's Executors.

*James*, 10 *Barn. & Cres.* 410 ; 1 *Johns. Cas.* 319 ; 1 *East*, 407 ; 2 *Mod.* 82 ; *Com. Land. & Ten.*, ed. of 1830, *p.* 108, 456 ; 8 *Mass. R.* 462.)

III. This is virtually an attempt to call in the aid of the court of chancery, to decree a specific execution of a personal covenant for the payment of money.

IV. The appellant, Nehemiah Rogers, had a right to the possession of all the assets, until after the final decree in the cause, or at least he should not have been deprived of such possession on mere motion before answer.

V. At all events, the appellant's claim to retain for his own debts, ought not, to have been disturbed until the final hearing and decree in the cause. (*Orphan Asylum* v. *McCartee*, 1 *Hopkins*, 429.   2 *Atk.* 126.   12 *Vesey*, 4.   2 *Eq. Cas. Abr.* 420. ' *Wil. on Ex.* 120, 122.   *Id.* 112, 1251.   5 *Johns. Ch. R.* 158.)

VI. The decrees are erroneous in ordering any part of the moneys received from the commissioners, under the French treaty, to be brought into court, and in not dissolving the injunction *in toto*. To the point that these are not equitable assets, see *Story's Eq.* 519, 520, 1, 2 ; 2 *Wil. on Ex.* 1033, 4, 5 ; [325] 2 *Atk.* 50 ; *Jeremy's Eq. Jurisdiction*, 525 ; 1 *Johns. Ch. R.* 119.

*Points insisted upon in behalf of the respondents, Hosack's executors :*

I. The deed of April 27, 1824, operated to create a specific lien and claim upon the moneys to be recovered by Archibald Gracie, his executors, administrators or assigns, on account of his claims on the French government in that deed mentioned.   (*See Bradley* v. *Root*, 5 *Paige*, 640 ; *Fashion* v. *Atwood*, 2 *Ch. Cas.* 6, 36 ; *Powell on Contracts*, 317 ; *Beckley* v. *Newland*, 2 *P. Wms.* 182 ; *Wright* v. *Wright*, 1 *Vesey, sen.*, 409, 412 ; 3 *Keb.* 304 ; *Co. Litt. Butler's note*, 145 *to* 232, 236 ; *Winch* v. *Keely*, 1 *T. R.* 622 ; *Yeates* v. *Grove*, 1 *Vesey, jr.* 280 ; *Row* v. *Dawson*, 1 *Vesey, sen.*, 332 ; *Ex parte Perfect, Mont.* 25 ; 3 *Deacon & Chitty*, 218, 334 ; *Lett* v. *Morris*, 4 *Sim. Ch.* 607 ; 1 *Mad.* 55, 331 ; 4 *Bro. Ch.* 6, 64 ; 1 *Sim. & Stu.* 590, 607 ; *Ex parte South*, 3 *Swanst.* 392.)

II. That deed being in its nature a general arrangement between a debtor and his creditors, gave a right to a ratable distribution of the fund among all the creditors entitled under the deed, without preference of one over another.   (*See Newland on Contracts, ch.* 25, *p.* 414 ; *Rose* v. *Leicester*, 4 *East*, 372 ; *Morris* v. *Bank of England*, 2 *Cas. Temp. Talb.* 218 ; *Moses* v. *Murgatroyd*, 1 *Johns. Ch. Cas.* 130 ; *Ellis*, 201, 206 ; *Wadeson* v. *Richardson*, 1 *Ves. & Beame*, 103, 110.)

III. By the operation of that deed upon the debts of the creditors assenting thereto, such debts were released at law, and will be upheld in equity only in subordination to the equitable rule of a ratable distribution.   (*See Cheetham* v. *Ward*, 1 *Bos. & Pul.* 630 ; 10 *Johns. R.* 518 ; 7 *id.* 207 ; *Co. Litt.* 232 ; *Kirby* v. *Taylor*, 6 *Johns. Ch. Cas.* 250.

IV. By the covenants in the deed of 27th April, 1824, N. Rogers, if entitled to retain, can only retain for his ratable share of the fund ; and this has been allowed on his own statement of the amount.   (*See Ram on Assets*, 271 ; *Hopton* v. *Dryden, Prec. in Ch.* 181 ; 2 *Ch. Cas.* 54.)

V. By the rules of law and equity, applicable to general agreements [326] between debtor and creditors, any right of retainer which might have arisen under any previous act of any of the parties, debtor or creditors, (as the will of A. Gracie, in the present case,) was waived by the coming into such general arrangement.   (*See Rose* v. *Leicester*, 4 *East*, 372 ; *McKenzie* v. *McKenzie*, 16 *Vesey*, 372 ; 2 *T. R.* 64 ; *Sadler* v. *Jackson*, 15 *Vesey*, 52 ; *Jockman* v. *Mitchell*, 13 *id.* 581 ; *Ellis, tit. Debtor and Creditor*, 200, 1, 2, 6 ; *Ram on Assets*, 271 ; 2 *Eq. Cas. Abr.* 426 ; *Hopton* v. *Dryden, Prec. in Ch.* 181.)

VI. Nehemiah Rogers, as surviving executor of Archibald Gracie, was as executor a mere trustee of the fund in question ; and it is of course, on application of parties entitled, to require payment into court of moneys, to which the executor in his own right has no title.   (*See Strange* v. *Harris*, 3 *Bro. Ch. Cas* 365 ; *Jordan* v. *Rothbey* 3 *Vesey*, 572 ; *Blake* v. *Blake*, 2 *Sch. & Lef.* 26 ; *Yare* v. *Harrison*, 2 *Conn. Ch. Cas.* 377 ; *Vigrass* v. *Binfield*, 3 *Mad. R.* 62 ; *Langley* v

*Hawk,* 5 *id.* 46; *Mortlock* v. *Lethes,* 2 *Mer. Ch. R.* 491; *Jenkins* v. *Jenkins,* 1 *Paige,* 243; 10 *Johns. R.* 65, 522; 12 *id.* 276; 2 *Sim. & Stu.* 217; 1 *Story on Eq.* 506, 7.)

VII. Nehemiah Rogers, as such executor and trustee, sets up claims in hostility to his trust, and ought not to be allowed against the will of the parties interested in the fund, and under the circumstances of his extreme age, the probable duration of the suit for the administration of the fund, his own hostile claims and conduct, and the situation of his own estate, to be permitted to hold and administer the body of the fund. (*See* 1 *Jack. & Walk.* 112; *Grant's Advice to Trustees,* 42; *Gordon* v. *Rothbey,* 3 *Vesey,* 572; *Andrews* v. *Powys,* 2 *Bro. Parl. Cas.* 476; 12 *Vesey,* 4; *Lupton* v. *Lupton,* 2 *Johns. Ch. Cas.* 627; *Haggerty* v. *Furniss,* 1 *Paige,* 321.)

VIII. Nehemiah Rogers, as executor or trustee, has no right to use the trust fund for his own purposes, nor to mix it with his own estate, which would embarrass the trust; he therefore can sustain no injury by a deposit of the [327] trust fund under the order of the court, for its protection; and his purpose to possess himself of it against the consent of the creditors of A. Gracie's estate, for the purpose of an unequal distribution in his own favor, rendered him an unfit depositary.

IX. The circumstances of the case stated in the bill of complaint, require an account to be taken of the debts provided for in the deed of April 27, 1824, of the funds realized, and with the trust character attached to the latter, require the jurisdiction of a court of chancery.

X. Where a fund is in dispute, the court will order it to be brought in and invested for the security and benefit of the claimants.

*Points insisted upon in behalf of Hosack's executors, on the cross-appeal :*

I. The amount of $13,172.02, allowed to be retained as the ratable share of Nehemiah Rogers, was more than his proportion on the principles of the order itself. That proportion ought to have been thus stated, viz.: As $255,905, the amount of all the debts, is to $73,000, the amount of the French fund, so is $42,464, the debt of N. Rogers, as by him stated, to $12,113; the true proportion, instead of $13,172.02.

II. The claim upon the French government for the loss of Gracie's property, insured with the Columbian Insurance Company, was a part of the claims on France, comprehended in the deed of 27th April, 1824, whether A. Gracie retained a lien on it or not. The question was as to the actual or legally implied intention of A. Gracie, rather than as to the right of absolute property in a *spes recuperandi.*

III. Until actual payment in full of a total loss of property insured, the insured has an interest in property abandoned, as security for his payment; and until an actual deed of cession of the property, all remedies must be pursued in the name of the insured. (*See Gracie* v. *N. Y. Ins. Co.,* 8 *Johns. R.* 245; *Randall* v. *Cockran,* 1 *Vesey, sen.,* 98; *and* 1 *Eden,* 130.)

IV. If the claim for the money in the hands of the trustee of the Com- [328] mercial Insurance Company is not comprehended in the deed of 27th April, 1824, and N. Rogers has any right, as executor, to retain it, then it ought to be taken into account upon his debt; and either he is to be postponed claiming under the deed of 27th April, 1824, until the other creditors have received an equal percentage, or he can only receive a ratable dividend from the French fund under that and in respect to the balance of his debt, after deducting the money realized from the first-mentioned claim.

V. The decree appealed from, ought to be so modified as to allow the defendant, N. Rogers, to retain, on his accountable receipt, only a ratable proportion of the money, payable on the certificates in his name as executor, and in Murray's name as trustee; and to require him to pay into the clerk's hands, for investment, all the residue, deducting the executor's commissions.

Rogers v. Hosack's Executors.

VI. No answer has been filed by Samuel Rogers, Henry Rogers, and Edward N. Rogers; and it is contrary to the practice in courts of equity to dissolve injunctions when the parties, charged with actual knowledge of the facts charged in the bill of complaint, have not fully answered. (*See Eden on Injunctions,* 59, 66; *Rowcroft* v. *Donaldson,* 1 *Fowl. Ex. Pr.* 286; *Bolieme* v. *Porter, Barn. Ch. R.* 352; *De Peyster* v. *Graves,* 2 *Johns. Ch. Cas.* 148; *Satterlee* v. *Bargy,* 3 *Paige,* 142.

*Points insisted upon in behalf of Rogers, on the cross-appeal:*

I. The defendant, Nehemiah Rogers, was entitled to retain his commissions on the whole amount of the moneys received under the French treaty.

II. He was entitled to retain the dividend of his debt, even on the principle that the covenant of Archibald Gracie contained in the assignment of the 27th April, 1824, was an equitable assignment or mortgage.

III. The chancellor was right in reversing the decree of the vice-chancellor, denying the dissolution of the injunction issued against the defendants, Nehemiah Rogers and James B. Murray, as to the moneys due and payable from the said James B. Murray, as trustee of the Commercial Insurance Company, [329] to the estate of the testator, Archibald Gracie, mentioned in the pleadings in this cause.

IV. The chancellor was right in dissolving all other injunctions issued in said cause other than as to the French funds, even on the supposition that the injunction ought to be retained as to those French funds.

V. The respondent claims the right of invoking, on the argument of this appeal, all the points made by him on his appeal from certain parts of the decree of the chancellor of 4th April, 1837, made in the above cause.

After advisement, the following opinions were delivered:

By Justice COWEN. One of the points sought to be raised on these appeals is certainly premature. Assuming that the principle of apportionment adopted by the chancellor under the articles of 1824, is to stand, the error of $1000 in calculating the arithmetical distribution, should have been corrected, or at least a motion should have been made for that purpose in the court below; and that motion might still be made on remitting the proceedings, though accompanied with our order of affirmance. The chancellor's order in which the mistake lies was interlocutory; and nothing is better settled than that before enrolment, all slips in the drawing and entering of such an order are amendable on summary application. Clearly, it is not the subject of an appeal, at least, until the motion shall have been made and denied. Could we suppose such a mistake to be carried through, and introduced, in despite of resistance, into the enrolled decree, a bill of review or appeal might be necessary; though I hardly think this would be so upon an error resting in mere calculation, and apparent on the face of the decree. (2 *Mad. Ch.* 537.)

Nor will this court, in general, interfere on appeal with the discretion of the court of chancery; and the rule, I imagine, applies to that branch of the order now in question, which retains Mr. Rogers in the general administration of Gracie's estate. An executor or other trustee is treated as a *quasi* officer of the court of chancery, and is often removed for misbehavior in his trust [330] —for insolvency or incompetency, either upon bill, motion or petition. In this case, the chancellor thought there was no foundation of any sort established by the evidence for taking away the trust confided to Mr. Rogers by the testator; and certainly a very slight case, if any, was made out against him. Such cases are almost always to be made out by circumstances and degrees of proof, upon the weight and effect of which different men may come to different conclusions: and where there is room for doubt, it seems to me that a court of appeal ought not to disturb the decision. The great age of Mr. Rogers, the protracted nature of this litigation, and the inducement of one who retains the fund still to spin out the litigation beyond its ordinary length, are urged as reasons for bringing the

Rogers *v.* Hosack's Executors.

whole estate under the administration of the court. But there is nothing in all this imperative upon the chancellor; it is an argument still addressed to his discretion. We may differ from him as to the circumstances of excuse upon which he has refused to set aside a regular default, yet we held at the last term, *Rowley* v. *Benthuysen*, (16 *Wendell*, 369,) that we ought not for that reason to open the default on appeal. Indeed, I understand the line of authority to stand almost without exception, that to warrant a reversal upon appeal from chancery, some definite rule of law or equity must appear to have been violated.

Another point, that the injunction was dissolved before all the answers of those defendants charged with actual knowledge had come in, is in a great measure a mere point of practice. It is answered first by a denial of the fact, and the printed cases do not appear to be so framed as to raise the question. They should have stated the want of those answers, at least; for I do not see how we can otherwise be justified in assuming that the point was made before the chancellor. He says nothing of it in his opinion, and the absent answers mentioned in the point are only those of Samuel, Henry and Edward N. Rogers. I presume, that had the least difficulty been raised on this ground, it would have been [331] obviated at once, by filing their answers, if that had not already been done. The answer of Nehemiah Rogers being in, and he being able to speak positively as to all the facts upon which the injunction depended, it is most likely that this technical objection was waived, or that something appeared to render it inapplicable to this particular case. The point, as it stands here in the abstract, certainly lays down the general rule of practice correctly; but it is many times relaxed in the discretion of the chancellor. (*Depeyster* v. *Graves*, 2 *Johns. Ch. R.* 149.)

The points, so far, have but little connection with the merits; and it appears to me that the insurance company fund can be also easily disposed of, whatever conclusion the court may arrive at upon the more difficult and certainly more important question in the cause. The right to that fund must be governed by a well settled rule in the law of insurance. Gracie having sustained a total loss of his property insured, by capture under the illegal decrees of France, abandons to the underwriters all hope of recovery, and obtains a judgment for the sum due on the face of his policy. The abandonment being rightfully made, operated as an assignment of all interest covered by the policy in the property insured, together with all claim against France for the damage done to the assured, (*Comegys* v. *Vasse*, 1 *Pet. S. C. R.* 193); so that the claim stood in the name and right of the underwriters. All this was long before Gracie undertook, by the articles, to appropriate his general French claims to the payment of Rogers and certain other creditors, between whom the controversy now exists. Before the date of those articles, it had ceased to be his claim; it belonged to another; and, as the chancellor remarks, whether his executor can now pursue the money paid by France specifically, and as security for the unpaid balance of the debt due upon the policy or not, the money when paid by the trustee will be unappropriated assets; as much so as if it were due and paid to Gracie's estate on a promissory note. If it be so, then it is not denied that Rogers has the right to retain. The ground taken is, that until the actual payment by the underwriter, he has but an inchoate conditional right; but I find no countenance given to such a doctrine in any book on the law of insurance, nor any adjudged case. On [332] the contrary, all the authorities are that the assignment becomes absolute from the time of the abandonment. It was not too strongly put upon the argument; the deed of a man's farm could not operate more clearly to change the legal right. That an abandonment passes to the underwriter all the claim of the assured against a foreign government on account of illegal capture, was held by the supreme court of the United States in respect to the late claims of our merchants upon Spain. (*Comegys* v. *Vasse*, 1 *Pet. S. C. R.* 193, 213, *et seq.*) Mr. Justice Story, who delivered the opinion of the court, examined

Rogers v. Hosack's Executors.

almost every material authority, and among others that of *Randall* v. *Cochran*, (1 *Ves. sen.*, 98,) wherein Lord Hardwicke is supposed, by the counsel for the creditors, to have laid some stress on actual payment of the loss. *Blaupct* v. *Da Costa*, (1 *Eden*, 130,) is but a counterpart of the case in *Vesey*. The result to which Mr. Justice Story came is thus expressed by him, at *p.* 214 of 1 *Peters:* " The law gives to the act of abandonment, when accepted, all the effects which the most accurately drawn assignment would accomplish." It is true that there, too, as is generally the case, an actual payment of the loss had been made ; but no additional influence whatever is ascribed to that circumstance. The words of *Marshall* and *Park*, in their treatises on insurance, are quoted and approved. These look to the abandonment alone as having the effect. They say the *spes recuperandi* is completely gone and passed to the underwriter by that act, and put down this as the very reason why he is liable to a full recovery. It is like an assignment of a chose in action, on a promise by the assignee to pay the price, instead of an actual payment. Surely the chose is none the less transferred because the consideration is not actually paid. It is a sale on credit. (*Heath* v. *Hall*, 4 *Taunt.* 326.) In *Mellon* v. *Bucks*, cited by the chancellor as 17 *Mart. Lou. R.* 371, but which is more commonly cited as the 5th volume of *Martin's New Series*, a mere abandonment of a cargo, *without either acceptance or payment*, there being a legal right to abandon, (which is not disputed in the case at bar,) was held a complete transfer. The language of Mr. Justice [333] Matthews is quite pertinent, and speaks the sense of all the books. " If," says he, " the abandonment was made under circumstances which legally authorized such a step on the part of the insured, the insurers being bound to indemnify him as for a total loss, must be considered as having become owners of the property which was abandoned, *ipso facto*, without any formal acceptance, but merely as a consequence necessarily following from the nature of the contract of insurance." Such an abandonment was held in that case to divest the interest of the assured in his goods insured, so that he could not sue the master and o··· ·rs as carriers, for their omission to transport the goods.

But Gracie individually still retained large claims for indemnity against France, which having been recently recognized by treaty, the commissioners certified them at $120,000 and upwards, on which the dividend to be received was $73,000. He owed N. Rogers and Sons $42,000, and N. Rogers, as his executor, claims to retain for a balance of that sum. Upon this simple statement of the case, it is not denied that he has a right to retain out of legal assets belonging to Gracie's estate, of which the $73,000 make a part. But it is insisted that Mr. Rogers has, in equity, cut off his right by joining as a party in the deed or articles of the 27th of April, 1824, upon which we are thus called to bestow a more particular consideration. [The judge here recites the substance of the articles of assignment, and then proceeds as follows :] Upon this state of facts, Rogers still claims the common law right to retain for the whole $42,000 due to the late firm of Nehemiah Rogers & Sons, after deducting the 35 per cent paid by the British claims. The assets derived from the French indemnity are legal assets, (2 *Wms. Ex.* 1033 *to* 1035, 1 *Story Eq.* 519 *to* 522,) not merely equitable, and therefore distributable accordingly among creditors *pari passu*. (*Ram on Assets*, 271.) I remarked before, that applying, as we must do, the law which declared the rights of executors, previous to the passage of the Revised Statutes, and laying the articles of agreement out of view, the right of retainer stands conceded. That right grew out of the principle that, as the duty of an executor was [334] often onerous, and by excepting the trust such an unity of the character of debtor and creditor arose as to take away all remedy by suit, the executor should be allowed this preference over creditors whose claims were of equal dignity with his own. (2 *Wms. Ex.* 685.) Has such a unity been produced in this case? Gracie covenanted with Rogers & Sons to pay them the balance of their debt with the French funds when he should receive them. True the covenant is in

form to the trustees and creditors jointly; but it enured to each severally according to their interests. For this it is enough to refer to *Withers* v. *Bircham*, (5 *Dowl. & Ryl.* 106,) briefly reported in 3 *Barn. & Cres.* 254. It seems to me extremely plain, that had Gracie survived the French treaty and received the money due upon these certificates, Rogers & Sons might have sued him at law for not paying their share; and that this would have been their only remedy, provided the release of Gracie's two co-debtors were to have the effect of extinguishing the original claim against him. Here is no assignment, no mortgage or pledge, no order, or any other specific apppropriation of the French funds, but a mere covenant to pay them over on their being obtained by the covenantor. That such an agreement does not create any lien, either at law or in equity, several point blank cases were cited on the argument. The most direct cases are the following: *Bradley's case, Ridgw. Rep. Temp. Hardw.* 194. *Ex parte Heywood. In the matter of Holmes,* 2 *Rose's Cas. in Bankr.* 355. *Williams* v. *Everett,* 14 *East,* 582. *Clayton* v. *Fawcett's admr's.* 2 *Leigh,* 19. *Brainard* v. *Burton,* 5 *Verm. R.* 97. *Hagan* v. *Sompeyrac,* 3 *Lou. R. by Miller,* 154. *Mandeville* v. *Welch,* 5 *Wheat.* 277. Indeed, among the cases cited to show that these articles of agreement may be made operative as an assignment, I have been unable to discover the least countenance for such a construction.

The result of the cases cited, is that the right of Rogers cannot be restricted in the amount which he is entitled to out of the French funds by the mere principle of equitable lien, as seems to have been supposed by the learned chancellor; and I think the cases are clearly sustained by the reasons on which they profess to go. Rogers might retain them for something, and his right lay in retainer alone.

Proceeding on the ground that Gracie was released from the original debts, a difficulty arises whether he can retain to a greater amount than the chancellor has allowed him in the name of *lien.* There is, to be sure, no express agreement in the articles regulating the proportions in which Gracie should pay, provided the French funds should come short, as they now appear to have done, of the balance to be made up; and hence it is supposed by the Messrs. Rogers' counsel, that any of these creditors might have sued Gracie, or his executor, upon the covenant, for his entire original debt; and they deduce from that a right of retainer co-extensive with the supposed right of suit. The deduction may be right, but the premises appear to me to be quite doubtful. The scope and object of the agreement appear to have been a full payment to the scheduled creditors, provided the funds were adequate, and a *pro rata* dividend in the event of a deficiency. Such is the express provision in respect to the British funds; and although not repeated in terms with regard to the French fund, yet this coming in as auxiliary, being a fund of the same uncertain character, indeed still more so, and the covenant to pay over running to the trustees and all the creditors, and being limited to the moneys actually to be received, the construction can by no means be called a forced one, which imports the *pro rata* clause from the assignment into the covenant. See *Wadeson* v. *Richardson,* (1 *Vesey & Beame,* 103, 110, 111.) If it be excluded, the covenant will then read, " On receiving whatever small amount of French funds, I will be liable to the full extent of the balance beyond what shall be paid by the British funds." Such a construction would seem to be quite absurd, if we suppose an intention to release Gracie from the original demands; and the consequence following, the contrary and more consistent meaning, would be still to keep the right of Rogers at least within the boundary allowed by the chancellor. An executor cannot retain for more than he could have sued for and recovered, provided he had not been executor. In this view of the case, Rogers would take the same sum allowed by the chancellor; but that would constitute his sole debt against the estate of Gracie; and not being secured by a pledge of the French funds, these would make a part of the general assets; Rogers taking out of these assets

Rogers v. Hosack's Executors.

his debt due on the covenant, in the name of *retainer*, instead of taking the whole from the French fund in the name of *lien*. The result to him would be the same, the only difference lying in the mode of reaching it. In either way, he could take no more than his twelve or thirteen thousand dollars due upon the covenant. I am perfectly satisfied, however, both upon principle and authority, that he has done nothing which legally or equitably confines him within such a narrow boundary; that the clause of release does not touch Gracie's individual liability as it stood originally; nor did the articles, they being but a collateral security, work an extinguishment of this or any other of the scheduled debts. (*Day v. Leal,* 14 *Johns. R.* 404.)

It is agreed by the counsel for both parties, and such is the undoubted rule of law, that in common legal effect, the *release* of the two persons jointly indebted with Archibald Gracie would have operated to release him also. The rule has generally, if not universally been applied, however, to cases where such co-debtors were released without the consent of the other. The debt being an entire thing, although each is liable for the whole, the destruction of all claim as to one or more, discharges the other. One reason doubtless is, that it takes away his power to enforce the right of contribution which he would otherwise have against the released debtor, though such reason standing alone would only go to work a discharge *pro tanto*. The release is like tearing off a seal from a bond, which subverts the whole contract. It loses its identity, and a new contract cannot be raised by the act of the obligee. The same legal effect would follow from obliterating or tearing off the name of one of the several joint makers on a promissory note. But the case is different where the alteration is by the consent of all the parties, accompanied with an intention that those only should be discharged whose names or seals are torn off, in the case supposed, or who are released as in the case at bar. Here [337] William Gracie and Charles King only are released in terms, with the consent of Archibald Gracie, the testator. Why was this so? I can imagine no other reason than the one which seems naturally and irresistibly to force itself upon the mind; the funds provided were deemed but an equivalent for the discharge of the junior partners; a discharge not sought for by the testator, their father, nor intended as to himself. Had it been otherwise, we cannot suppose that the distinction would have been made. His covenant in respect to the French funds, would have had the same force and extent with as without a release to himself. His intention, therefore, still to remain liable, for reasons satisfactory to himself, seems too plain for dispute, and we have only to inquire whether the structure of the articles has secured that object. Upon principle there is nothing to prevent such an arrangement. One obvious mode of doing the business would be to execute a separate and independent security for the whole. But why is not an assent to a partial release, the same thing? The intent is equally plain, and it seems to me but another form of assuming by one the joint debt of three. The covenant or promise of the two is cut off, leaving it the sole covenant or promise of the other. In legal effect it comes to that, and may be so treated in pleading. It might have been so treated, even before the release, and a several recovery had, if the non-joinder were not pleaded in abatement. The consent is but a waiver of that formal defence, and so the remedy becomes clear.

We thus see, that in pronouncing the original debt to N. Rogers & Sons due from Gracie and undischarged by the release, we should but be carrying out the maxim that when the reason of the law ceases, the law itself ceases; but we are not left to apply that maxim at random. The very point now before us has recently been decided by the supreme court of Pennsylvania, in *Burson v. Kincaid*, (3 *Pennsyl. R.* 57.) There was a judgment against *Dennis Cain* and *John Cain* in favor of John Bell. He with the consent of *Dennis*, released the estate of John Cain, (the co-debtor, John Cain, being dead,) and the question was

Rogers *v.* Hosack's Executors.

[338] whether *Dennis* was not also discharged. The court held he was not by reason of his consent. Mr. Justice Kennedy delivered the opinion of the court. He said, " In the abstract it is certainly true, and the principle of law well settled, that if a creditor release one of two *joint debtors,* whether they be indebted upon a simple contract, bond or judgment, it will also be a discharge of the other from the debt. Why is it so? Because otherwise the whole burthen of the debt will be thrown upon one of them instead of both, which would be directly contrary to their understanding and contract. Upon the same principle it has been held that if the obligee in a bond given to him by two or more *jointly,* tear off the seal of one of the joint obligors, or in any manner cancel the bond as to one of them, it discharges all the rest. It was in its concoction the joint bond of the whole; but the moment it is cancelled by the obligee as to one of the obligors, it ceases to be the bond or deed of all. In short, it ceases to be the same bond, if bond at all it can be called. By the original contract under which it was given, it was agreed and made to be the joint obligation of all; and without a new agreement between the same parties, it cannot be made the bond of a less number; at least it cannot be changed and made the bond singly of any one or more of them short of the whole number, without their consent. To make it the bond of one instead of two, necessarily increases the weight of the obligation; and no man is to have an obligation imposed upon him without his consent. But an obligee or covenantee may release one of two *several obligors* named in a bond, or one of two *several covenantors* in a deed, or cancel the bond or deed as to one, by *tearing off his seal, without the consent of the other, and for this reason* too, that it does not increase the responsibility of the other obligor or covenantor, or change in any manner the nature of his obligation or covenant. It was the bond or deed of each *singly* before, and the obligee or covenantee had a right to look to either singly for the fulfilment of it, and the one therefore can in no wise be injured by cancelling the bond or deed as to the other. (*See Matthewson's case,* 5 *Co.* 44.) " So it is well settled that if the name of one of [339] two or more joint obligors be stricken out or erased, or his seal torn from a bond *by the consent of the obligee and the other obligors,* it shall cease to be the bond of him whose name is so stricken out or erased from it; *but shall from that time be the bond of the others.* And for what reason? Because it was their agreement that it should be so. Their agreement alone, in this respect, without more, is equivalent to a new and re-execution or re-delivery of the bond, as their act and deed. A mere formal delivery or re-delivery of it is unnecessary. (*Barrington* v. *The Bank of Washington,* 14 *Serg. & Rawle,* 424; *Speaker* v. *The United States,* 9 *Cranch,* 28.) And this is upon the principle that they have assented to it, and if they were not held to be bound by the bond in this instance afterwards, it would be a reproach upon the law and the administration of justice; because it would be to permit the remaining joint obligors to violate most grossly their own agreement, and thereby to commit a most palpable fraud upon the obligee, and cheat him out of his money." The learned judge then proceeds to apply this reasoning to the case before him; but the application is extremely obvious to that and all the like cases. The rule that a release to one shall operate to release another is harsh and technical, and has been much restricted in its operation by several adjudications. (*Rowley* v. *Stoddard,* 7 *Johns. R.* 207, *and cases there cited.*) Such an effect is always contrary to the intent of the releasor, and it would be truly extraordinary that it could not be waived by the very party for whose benefit the rule was intended. *Quilibet potest renunciare juri pro se introducto.* (2 *Inst.* 183. *Branch's Principia.*) Neither N. Rogers & Sons nor Archibald Gracie, intended that the debt should be released as to the latter. He therefore expressly renounces the benefit of that law which would otherwise have operated in his favor, and should be the last to claim the technical consequence sought to be enforced by this bill; nor does he—but third persons claim that this should be so whether he or his personal representative will or not. So

Rogers v. Hosack's Executors.

in *Burson* v. *Kincaid*, subsequent judgment creditors struggled to get a prefer-
ence, on the ground that Dennis Cain was released; but the court would
not permit this.   The case at bar is a stronger one ; for the very creditor [340]
here represented by Messrs. Hosack and Blunt was a party to the agree-
ment, which as we have seen declared in effect that Gracie was not to be released.
In all justice and honesty they ought to share the legal results of what is to be
deemed their own agreement.

It is scarcely necessary to observe that Mr. Rogers' right of retainer is in
no way affected by the *statute of limitation.* I should·suppose it quite clear
that the statute could, under no circumstances, be predicated of such a right, (2
*Wms. Ex.* 693 ;) but be that as it may, both parties here assume that in law, ·
conscience, and honor, the whole of the original debt, with interest, excepting what
the British funds paid, is still due.

I will only add, that though the payment of this debt be obviously due to Mr.
Rogers, as a measure of reward for a pilgrimage of responsibility, not to say
anxiety and suffering, incurred by him as the friend of Mr. Gracie, yet in reach-
ing the conclusion that he still holds the right of full retainer, I am sure I have
not deemed it necessary to strain any principle either of law or equity beyond its
legitimate and acknowledged strength.

In my view of the case, Gracie, the testator, always remained liable to an ac-
tion for the whole schedule debts of his firm ; and the appointment of Rogers his
executor changed the remedy by action for the demand of N. Rogers & Sons into
the more direct one by his own act, the common law right of retainer, for the
whole debt of $42,000, or the balance which shall remain due after deducting
what has been discharged by the British claims.

I am therefore of opinion that the decree, so far as it denies or interferes with ·
this right, should be reversed, but in all other respects affirmed.   Should the
court come to this conclusion, the true sum for which Mr. Rogers is to retain will
be settled before a master on remitting our proceedings.   And on the coming
in of the master's report, the chancellor will take order for dissolving the injunc-
tions which relate to the certificates, as to the whole debt due to *Rogers*
instead of a *pro rata* share as they now stand.   For the present, I move [341]
the simple proposition, " *a reversal in part, by decreeing that Mr. Rogers
has a right to retain for so much of the scheduled debt of N. Rogers & Sons, as has
not been actually paid.*"

By Senator DICKINSON.   The appellant, Rogers, having accepted and entered
upon the office of executor previous to the first of January, 1830, had an un-
questionable right to retain out of any assets which might come to his hands for
his own debt, in preference to other debts of the same class.   The operation of
the Revised Statutes in this respect being *prospective* only, that right has not been
lost or impaired.

The principal question to be decided is, whether the instrument of the 27th of
April, 1824, was intended to give certain creditors, among whom are the re-
spondents, a *specific lien* upon claims which Archibald Gracie had upon the French
government at the date of the instrument.   The *covenant* contained in this instru
ment, it is contended by the respondents, operated to create a *specific lien* and
claim upon the moneys to be received by Archibald Gracie on account of his
claims upon the French government.   And his honor, the chancellor, in delivering
his opinion on the making of the decree now under consideration, says : " I have
no doubt upon the question that the covenant of Gracie to pay the creditors out
of the moneys which should be received by him, or his representatives, on account
of his French claims, was an equitable mortgage, or specific appropriation of that
fund, for the payment of the creditors who came in under the assignment, so as
to entitle them to a preference over other creditors in relation to that fund, so far
as the proceeds thereof can be traced and identified."   This decision seems to
have been made principally upon the authority of *Mauran* v. *Clark*, (3 *Paige*,

Rogers v. Hosack's Executors.

373) *and Bradley* v. *Root,* (5 *id.* 632;) but neither of these cases, I apprehend, will be found *in point,* upon a critical examination. In *Mauran* v. *Clark,* Hodges, an extensive shipping merchant of Providence, previous to June, 1829, was indebted to Mauran, of the city of New-York, in the sum of $7000. Upon application for payment, he directed his agent in Curracoa to close his mer-

[342] cantile affairs at that place, and to ship the balance of his funds to New-York, consigned to Mauran. He soon after wrote Mauran, among other things, "I have ordered the balance of my funds at Curracoa to be forwarded to you, which when you receive, you will please place to my credit in account." The funds were duly shipped in doubloons consigned to Mauran, and the bill of lading delivered to the master of the brig. Two days after the doubloons were shipped, Hodges failed, and made a general assignment of all his property. The doubloons were received at the custom-house and claimed by Mauran, and shortly after, on the same day, by the assignees. Upon bill of interpleader, it was held, "that the shipment of the doubloons to Mauran, by the direction of Hodges, and the delivery of the bill of lading to the master of the brig, under *the circumstances of the case,* gave Mauran a specific lien upon that property, which was not divested by the general assignment." But it will be perceived that this was not a mere covenant or agreement to pay Mauran out of the Curracoa property; the *peculiar circumstances* which influenced this conclusion must have been the shipping of the doubloons, their consignment to Mauran, the letter of advice to him, the delivery of the bill of lading, and the receipt of the doubloons by Mauran at the custom-house. It was governed entirely by the *acts* of the parties, independent of, and having no relation to, any agreement whatever. In *Bradley* v. *Root,* Stewart, a mail contractor, assigned his interest in his mail contract to Bradley. The assignment recited Stewart's contract with the post-office department, and concluded as follows : " Now, therefore, it is agreed between the said Burr Bradley and the said Sylvester Stewart, that the said Burr will well and faithfully carry the said mail, agreeable to the terms of the said contract first mentioned, and that the said Burr shall, for doing the same, receive the full benefit of said contract, and be entitled to all moneys due from the post-master general, agreeable to the terms of the said contract for carrying said mail, and that the said Sylvester will deliver and pay over to the said Burr all moneys or drafts received by said Sylvester, by virtue of said mail contract." I fully concur with his honor, the

[343] chancellor, that this is clearly an *assignment in equity.* It provides that Bradley shall perform all the services in carrying the mail, and that he " shall, for doing the same, receive the full benefit of said contract, and be entitled to all moneys due from the post-master general, agreeable to the terms of said contract for carrying said mail." Here is an assignment in positive and express terms, though not clothed in apt and technical language. It declares the *full benefit* of the contract to belong to Bradley, and authorizes him to receive the money. The covenant that Sylvester will deliver and pay over to Burr all moneys or drafts received by him, &c., does not change the nature of the assignment. It was probably intended to protect more perfectly the interests of Bradley, in case the drafts came to the hands of Stewart.

In *Yates* v. *Groves,* (1 *Vesey, jr.,* 280,) cited by the respondent's counsel in support of the position taken by them, Lord Thurlow decided that no *order* to pay a debt out of a particular fund belonging to a debtor, constituted an equitable assignment of the fund *pro tanto,* and gave to the creditor a specific lien. The same doctrine was held in 1 *Mad. R.* 55; 4 *Simons,* 607; 1 *Russ. & Mylne,* 602; and 3 *Deac. & Chitty,* 218. Indeed, this is established as to *orders,* beyond question or controversy. But it requires little discrimination to discover the difference between an order, which, both in terms and legal effect, contains an assignment, or the elements of one, being a direction to one to pay or deliver, with power to the other to receive and convert or appropriate, and a *simple, naked covenant* or *agreement* to pay out of a particular fund, unaccompanied by any

Rogers v. Hosack's Executors.

words of transfer, or any power or authority whatever in the premises.  In *Williams* v. *Everett*, (14 *East*, 582,) one Kelley, a merchant at the Cape of Good Hope, made remittances to Everett, his banker in London, with directions to pay over certain sums to specific creditors.  Everett received the money, but refused to pay it over in pursuance of Kelley's directions.  Williams, one of the creditors to whom Everett was directed to pay the money, brought his action against Everett for money had and received; and it was held by Lord Ellenbo- [344] rough that no action lay by Williams, and that it was only money had and received to the use of Kelley. In *Clayton* v. *Fawcett,* (2 *Leigh's Virginia R.*) Clayton, in the autumn of 1818, sold Fawcett a drove of cattle for $900, upon a credit.  Fawcett drove the cattle to Richmond and sold them to Carlisle, and took his bond in part payment.  The bond was left with one Baker, with directions to hand to an attorney if not paid at maturity.  Fawcett made several payments to Clayton, which reduced his indebtedness to about $200, and this balance remaining due in October, 1820, Fawcett addressed a line to Baker, which he delivered to Clayton, in these words :—" Sir: When you collect the money from Mr. Carlisle for me, and I should not happen with you, you will please pay the same to Mr. Clayton, as I am indebted to him about $200 of the money due to me from Carlisle, and oblige your friend, &c."  In December, 1820, Clayton presented the note to Baker, and learned that he had previously put the bond into the hands of an attorney for collection.   On the 21st of December, Fawcett died insolvent ; and in February following, Clayton applied to the attorney, who admitted he had collected the money, but refused to pay it over until the right to it should be judicially determined.  Clayton filed his bill against the executors of Fawcett, but the bill was dismissed by the chancellor, whose decision was affirmed by the court of appeals—the president of the court, who delivered the opinion, saying, the order contained " *no words of assignment or transfer.*"  In *Lepard* v. *Vernon,* (2 *Ves. & Beame,* 54,) it was held that a power executed by a debtor to creditors, enabling them to procure and receive from the board of ordnance, " all such sum and sums of money as now are, or which may hereafter, from time to time, become due and payable to him," did not (unaccompanied by an assignment) operate as an appropriation of the money to that specific object, so as to prevent it from becoming a part of the testator's estate.  In *Brainard* v. *Burton,* (5 *Verm. R.* 97,) and *Hagan* v. *Sompeyrac,* (3 *Lou. R.* 154,) it was held that a promise to pay a debt out of a growing crop, did not operate as an assign- [345] ment, or give the creditor a specific lien.

None of these cases, however, go to establish the point contended for by the appellant's counsel, though they bear hard upon the general doctrine.  But the case of *Bradley* v. ——, (*Bridg. Ch. Cas.* 194,) decided by Lord Hardwicke in 1744, if it can be regarded as authority, places the question beyond the pale of legitimate controversy.  In that case, the learned chancellor refused to hear an argument, and decided with emphasis, that " a promise to pay a debt out of a particular fund, does not create a specific lien, even though the creditor forbear to sue upon such promise," accompanied with a reason which would adorn the judicial conclusion of a more commercial age, viz. : that, " the consequences of such decrees would be a great stagnation of commerce, and repugnant to that course of circulation, which the well-being of trade demanded."  I can discover no reason why this case should not be regarded as high authority.  The decision was pronounced by a judge of distinguished learning and ability ; and although near a century has since elapsed, its conclusions apply to our condition with accumulated force.  It combines the wisdom of the past with the convictions of the present, and successfully appeals for its support to all history and experience.

But it is said that this is a *covenant* on the part of Gracie, and not a simple contract or agreement.  This is so ; but does it, for *this* purpose, give it any additional consequence?  For all the purposes of this question, the contract might as well have rested in *parol.*  An assignment of a debt may be as effectually made

by parol as by deed. (4 *Taunton*, 326.) Again, it is asked, why was there any allusion to the French claim, if it was intended as a personal covenant merely? Why, was it not a new covenant on the part of Gracie to make up the deficiency? To this I reply, we are not bound to speculate as to the particular reasons which induced its insertion in the covenant in that peculiar form, after we have satisfactorily ascertained that it was not intended as, and does not have the effect to give a specific lien upon the French claim. But I see no difficulty [346] in arriving at the true reason which influenced Gracie to covenant in that particular form, and apprehend it may be found in the recital of the same instrument, to wit: "which said debts the said parties of the first part are at present unable to pay and satisfy, but are willing to provide for the security and payment thereof in the manner hereinafter mentioned." The firm of A. Gracie & Sons was unable to pay, but were willing to secure and provide for the payment "as *hereinafter* mentioned." The provisions alluded to assign the English claim absolutely by the firm: the creditors release the two junior members, and A. Gracie personally covenants that if the English fund shall prove inadequate and insufficient to discharge the specified debts, such deficiency shall be "made up and paid out of any moneys which shall or may be recovered and received by the said Archibald Gracie, &c., of and from the French government, &c., and that such deficiency shall be paid out of said moneys when and as soon as the same shall be received by the said Archibald Gracie, his executors, administrators or assigns." I have no doubt it was the intention of the parties to give A. Gracie, who assumed and took upon himself the payment of any deficiency there might be, after exhausting the English funds, time, until he should obtain a settlement of his claim with the French government, and then such deficiency was to be paid out of said moneys when and as soon as the same should be received by Gracie. I do not discover any evidence that it was the intention of either the creditors or Gracie that he should be released from any portion of the debt; on the contrary, it would seem that all had confidence in obtaining a sufficient sum out of the English claim to discharge all the debts, as the covenant contains an express provision for refunding the *surplus* of that claim to Gracie. Besides, Gracie covenants, in case the English funds should prove insufficient in amount, that the *deficiency* should be paid. This, in the opinion of the parties to the instrument, undoubtedly provided for every reasonable contingency, and rendered it unnecessary to multiply further provisions. This instrument was drawn up with professional skill, and apt and proper language is [347] employed to express the intention of the parties. The English claim is disposed of by words of "*assignment and transfer*," and the contingency of a surplus is expressly provided for. Can it be possible, then, that with the intention to create a specific lien or equitable mortgage upon the French claim, the parties should have left this large fund to the caprice of implication, treating it as of less consequence than an imaginary surplus from the English claim? The covenant on the part of Gracie is, that the *deficiency* shall be paid, when the moneys shall be received from the French claim, by him, his executors, administrators or *assigns*, a term which would scarcely have been employed if the fund had thereby been placed beyond his control. It is well established by the decisions of our own courts, that in the construction of a written instrument, a particular specification will exclude things not specified; and that when there is an express covenant in a deed, it takes away all implied ones. (1 *Johns. Ch. R.* 183; 11 *Johns. R.* 122.) In short, from the whole current of decisions, as well as from the intention of the parties, as indicated by the covenant of the 27th April, 1824, I have no doubt that it was intended as a personal covenant merely and that in legal or equitable effect, it gave no specific lien upon the French claim. The instrument is either a personal covenant or an assignment. It can hold no intermediate or amphibious character. The language is neither obscure or equivocal; and when taken either in its most technical sense, or according to

Rogers v. Hosack's Executors.

its most obvious and popular acceptation, is manifestly a *mere covenant* on the part of A. Gracie to pay a certain contingent deficiency when he receives the money upon his French claim, and nothing further.

But it is said that if no specific lien was given upon the French claim by that deed, by its operation upon the debts of the creditors assenting thereto, such debts were released at law, and will be upheld only in a court of equity in subordination to the equitable rule of a ratable distribution; and it is contended that Rogers, by becoming a party to that deed, and thereby releasing the junior members of the firm, necessarily at law released A. Gracie also, and has no claim against him, except in equity, and that only upon the principle [348] of a ratable distribution. There can be no doubt of the general principle, that where one or more of several *joint* obligors are released, such release discharges the co-obligors, and may be pleaded in bar. (6 *Johns. Ch. R.* 250; 7 *Johns. R.* 207.) · Nor is it material whether the release is by *deed* or by operation of law. (*Cheetham* v. *Ward*, 1 *Bos. & Pul.* 630.) This, however, is not the rule where the obligors who remain *consent to the release.* · In *Burson* v. *Kincaid*, (3 *Penn. R.* 57,) Kinnedy, justice, who delivered the opinion of the court, says: " It is well settled, that if the name of one of two or more *joint obligors* be stricken out or erased, or his seal torn from a bond by the *consent of the obligee and the other obligors*, it shall cease to be the bond of him whose name is so stricken out or erased from it, but it shall from that time be the bond of the others. Their agreement alone in this respect, without more, is equivalent to a new and re-execution or re-delivery of the bond as their act and deed. A mere formal delivery or re-delivery of it is unnecessary. If they were not held to be bound by the bond in this instance afterwards, it would be a reproach upon the law and the administration of justice, because it would be to permit the remaining joint obligors to violate most grossly their own agreement, and thereby to commit a most palpable fraud upon the obligee, and cheat him out of his money." The execution of the deed by Archibald Gracie is sufficient evidence of his consent to the release of the junior members of the firm, to leave him liable upon the original indebtedness; and besides, from the view I have taken, he was liable for the whole *deficiency* upon his covenant on the receipt of the money upon his French claim. Upon either view, I am of opinion the indebtedness remains unimpaired.

Although it is usual to order a fund to be brought into court when it is in danger, or when no claim is interposed on the part of the trustees for cause shown, yet the court will not in any case from mere caprice divest a party of funds, to the possession of which he is entitled, or to which he sets up a claim founded on reasonable or probable grounds of truth and justice, and place [349] them beyond his control, unless the fund is in danger, either from misbehavior, insolvency, or incompetency of the trustee or executor. (*Orphan Asylum* v. *McCartee*, 1 *Hopkins*, 429; *Hoffman's Ch. Pr.* 320, and cases there cited.) In this case the executor is not insolvent, but is in possession of and the proprietor of a large estate. He is not guilty of misbehavior, but can point to a life of integrity and rectitude, as evidence of the past and a guaranty for the future. Nor has age, by returning to him the mental imbecility of childhood, rendered him incompetent to discharge the trust assigned him by one who must have been qualified to judge of his capacity and fidelity.

Upon the whole, I see no just grounds for interfering with the funds in the hands of Rogers, the executor. He is entitled to retain to the full amount of his debt from the French fund, and the balance belongs to him in his representative capacity. The injunction should therefore be dissolved, and the decree of his honor, the chancellor, be reversed; but so much of the decree as reverses the decree of the vice-chancellor of the first circuit, which is brought up by the cross-appeal of Hosack's executors, for reasons assigned by the chancellor, I am of

opinion should be affirmed, and that Nehemiah Rogers, the appellant, should be. paid his costs out of the funds in his hands as executor.

Upon the question being put, *Shall this decree be reversed?* the members of the court divided as follows:

*In the affirmative:* The PRESIDENT of the Senate, *Justices* BRONSON and COWEN, and *Senators* ARMSTRONG, J. BEARDSLEY, BECKWITH, DICKINSON, DOWNING, H. F. JONES, LACY, LAWYER, LOOMIS, MACK, POWERS, SEGER, SPRAKER, TALLMADGE, WAGER—18.

*In the negative:* *Senators* McLEAN and WILLS—2.

Whereupon the decree of the chancellor was reversed upon the principal question, and a modified decree made in conformity to the opinions delivered.

