BRUNDRED AND OTHERS *vs.* MUZZY AND WELLES.

An agreement between a manufacturing firm and a firm of commissio: merchants, whereby, in consideration of their indebtedness, the former transferred the control of their business to the latter, does not constitute the members of the two firms partners, and jointly liable for debts afterwards contracted by the first named firm.

Error to Passaic Circuit Court.

This is an action of assumpsit, commenced in October, 1853, for the recovery of the amount of a promissory note, of which the following is a copy, to wit :

"Oldham Works, Paterson, N. J., July 19, 1853. $473.92.

Two months after date, we promise to pay to the order of Messrs. Muzzy and Welles four hundred and seventy three 92-100 dollars, at the city Bank in New York, value received.

(Signed)      B. Brundred, Son & Co."

Judgment by default was taken against William J. Brun dred and Henry Hawley. Abraham Bell and James Bell pleaded the general issue. And thereupon the cause came on to be tried at the Passaic County Circuit Court, on the first Tuesday of January, 1855, at Paterson, before the Honorable Elias B. D. Ogden, one of the judges of the said court, by a jury of the said county, then and there duly empannelled and sworn to try the said issue.

On the trial of the said cause, it was proved, on the part of the plaintiffs, that the firm of B. Brundred, Son & Co. had been in existence from the 1st of May, 1851, up to the time of the giving of the said note in the declaration declared on, and was composed originally of Benjamin Brundred, William J. Brundred, and Henry Hawley; that Benjamin Brundred died on the 20th of April, 1853; that the business of the firm was the manufacture of machinery at Oldham works, near Paterson, in the county aforesaid, and that the note in question was signed by Henry Hawley, one of the defendants. It was further shown that during all that period, from the commencement of the said firm, the firm of A. Bell & Son, of New York, commission merchants, composed of the defendants, Abraham Bell and James Bell, acted as commission merchants for the said firm of B. Brundred, Son & Co. in the disposal of their manufactured stock, and the collection of their drafts and bills receivable, at a commission of two and a half per cent. on the amount of

sales, and from time to time made advances of money to the said firm of B. Brundred, Son & Co. to enable them to carry on their business. The advances thus made were to a considerable amount, exceeding the proceeds of the assets of B. Brundred, Son & Co. placed in their hands, leaving a large balance due to Abraham Bell & Son on account. The amount advanced in the course of two or three months exceeded ten thousand dollars, and thereupon the members of the firm of B. Brundred, Son & Co. gave to A. Bell & Son their bond for ten thousand dollars, bearing date the 1st of May, 1851, payable the 1st of May, 1854, with interest quarter yearly, at the rate of six per cent. per annum, which bond was secured by a mortgage given, by the said Brundred and wife, on certain real estate at Oldham aforesaid, on which the factory was located.

The balance of advances continued to increase in favor of Abraham Bell & Son until 1st of February, 1852, when it amounted to seven thousand three hundred and ninety-one dollars and twenty-four cents, independent of the ten thousand dollars secured by the said bond and mortgage; and further to secure said advances, B. Brundred, Son & Co., on the twenty-fourth of January, in the year last aforesaid, assigned their tools, patterns, &c., used in prosecuting the business, to A. Bell & Son, as collateral security.

In July of the same year the said Benjamin Brundred assigned to A. Bell & Son a patent right belonging to him, also as collateral to the said indebtedness.

The firm of B. Brundred, Son & Co. had previously obtained a license, in consideration of certain payments, to use the said patent.

On the 14th of September, 1852, the same year, another bond and mortgage for ten thousand dollars, similar to the first, and upon the same property, was given to Bell & Son, the balance of indebtedness at that time being

about sixteen thousand dollars, independent of the amount covered by the first bond and mortgage, leaving about six thousand dollars due A. Bell & Son, independent of both bonds and mortgages. This balance continued to increase until the 1st of February, 1853, when it amounted to nine thousand nine hundred and fifty-seven dollars and fifty-two cents, independent of the amount covered by the said two bonds and mortgages.

On the 20th of November, 1852, B. Brundred, Son & Co. acknowledged a formal delivery of the possession of their tools, patterns, &c., to A. Bell & Son, by an endorsement on the before mentioned assignment of the same.

On the twentieth of December following, A. Bell & Son gave to B. Brundred, Son & Co. a receipt in the following terms, to wit:

> " New York 12 mo. 20, 1853.
> B. Brundred, Son & Co. Oldham.

The tools in your machine shop assigned and this day del'd to us, we hold as collateral for the large amount due us by you, and trust you may soon be in a position by lessening the amo', to justify us in returning them to you. In the mean time we appoint your partner Henry Hawley our agent, to hold them for our ac't.

Your assured friends,
(Signed) Abraham Bell & Son."

On a copy of which receipt the said Hawley endorsed and signed the following, to wit: " Rec'd the within property from A. Bell & Son, in trust for their a'c. Dec. 20th, 1852."

On the 2d day of February, 1853, the following agreement between the firm of B. Brundred, Son & Co. and A. Bell & Son was entered into, to wit:

" We, the undersigned being largely indebted to Abm. Bell & Son of the city of New York, now in consideration

of such indebtedness and for the better securing the same to them and such further sums as they may advance do hereby authorize and appoint said A. Bell & Son to the entire management and control of all our business, from this day forward, until we can reduce our indebtedness to them, to the sum of ten thousand dollars. But until the debt is so reduced we do give them sole power to collect all monies due to us, and to pay all indebtedness now made, or that shall hereafter be made in conducting our business of making machinery &c. And we hereby deliver unto them all machinery manufactured, in whole or in part, all stocks of material, tools, and fixtures now at our works at Oldham, to be used for the payment of our indebtedness to said Abm. Bell & Son and other parties; and we do further agree not to contract any indebtedness without the written consent of A. Bell & Son, and to limit our drawings for the support of our families, not exceeding the sum of one thousand dollars each, as regards William J. Brundred & H. Hawley, for the current year, commencing from this date, subject to two hundred dollars each additional for present outstanding debts, and we do authorize A. Bell & Son to engage the services of a suitable person to take charge in their behalf, and will unite with such person, doing all in our power to promote the united and best interest of the concern. The compensation of such person to be a charge on the business in the proportion of two-thirds, and one-third by A. Bell & Son. If however we find his services full benefit to the extent of his entire compensation, then we are willing it be all a charge on the business. If after the expiration of four months, we, or A. Bell & Son, are of the opinion, that the business is not profitable, then upon either party giving the other three months notice, the whole concern shall be discontinued, and the entire stock of tools and fixtures be sold at public auction, at such time as A. Bell & Son shall direct after the expiration of

three months aforesaid. It is further to be understood, if at any time all the indebtedness due to A. Bell & Son, over and above ten thousand dollars, be paid them by us, that they surrender and reconvey all herein conveyed to them, not otherwise disposed of for the benefit of the concern.

(Signed) B. Brundred by his atty. W. J. Brundred, W. J. Brundred, Henry Hawley.

In pursuance of this agreement, A. Bell & Son appointed one Albert Brett, of the city of New York, to take charge of the business of B. Brundred, Son & Co., in pursuance of said agreement; and the business was carried on under said agreement, without any change in the name of the firm, from that time until the 15th of August, 1853, or thereabouts, when A. Bell & Son refused to accept any further drafts or pay any more bills for the firm of B. Brundred, Son & Co.

The course of business during this period was much the same as prior to the execution of the said agreement; all the business of the concern was done in the name of B. Brundred, Son & Co., (the original articles of partnership having provided that the firm should continue notwithstanding the death of either of the partners). William J. Brundred superintended the manufacturing department; Henry Hawley kept the books and made drafts, and the said Brett procured orders around the country, and generally effected such purchases as were made in New York, acting (as he testified), in the transaction of all the business done by him, as the agent and in the name of the firm of B. Brundred, Son & Co., alone. The defendants did not dispute, but that A. Bell & Son knew of the manner in which the business was conducted by the said Brett. A. Bell & Son transacted the business of the concern in New York on commission, in the same or a similiar manner, and at the same rate of commission, as they had done before

the said agreement was entered into, received the notes, drafts, and bills receivable of B. Brundred, Son & Co., for collection, and continued making advances to said firm, as they required money for their payments, which was usually effected by drafts upon A. Bell & Son by the defendant, Hawley, in the name of B. Brundred, Son & Co.

The balance of indebtedness for such advances, independent of the twenty thousand dollars secured by bond and mortgage, amounted, on the 1st of May, 1853, to the sum of twelve thousand four hundred and ninety-seven dollars and twenty-nine cents, and on the 1st of August, 1853, to twenty-three thousand eight hundred and ten dollars and thirty-five cents. A. Bell & Son, however, holding at the last date contracts and consignments against a portion of said balance, from which they realized, after refusing to honor the paper of B. Brundred, Son & Co., sufficient for, and applied by them to reducing the said balance, on the 1st of November, 1853, to eight thousand nine hundred and eighty-four dollars and twenty-two cents, which yet remains mostly unpaid. After A. Bell & Son refused further to honor the drafts of B. Brundred, Son & Co., in August, 1853, the works were subsequently conducted by C. S. Van Wagoner, on behalf of the estate of B. Brundred, deceased, and William J. Brundred and Hawley, the surviving members of the firm, the tools not having been removed or sold by A. Bell & Son.

The note on which this suit was brought was one of three notes, of same date, given in payment of an account for lumber, furnished by the plaintiffs to the firm of B. Brundred, Son & Co., between the 2d of February, 1853, and the date of the notes.

Before any of this lumber was furnished, the defendant Brundred and the said Brett came to the office of the plaintiffs, at their lumber yard, and entered into conver-

sation with the plaintiffs' clerk about buying lumber, and in the course of such conversation Mr. Brett said, "we are going to use considerably more lumber than has theretofore been done; if you will sell us as cheap as we can get it in New York, we will patronize you." The orders for the lumber were afterwards signed by the defendant, Hawley, in the name of B. Brundred, Son & Co., and were sent from time to time, as the lumber was wanted, and the account was charged on the books of the plaintiffs to B. Brundred, Son & Co.

The defendant, Hawley, being examined as a witness on the part of the plaintiffs, testified, amongst other things, that he had never regarded the defendants, Abraham and James Bell, as partners in the firm of B. Brundred, Son & Co., or as individually liable for the debts of that firm; but said: "My understanding was, that in conducting the business under the agreement of February 2, 1853, (which we considered as a kind of experiment to resuscitate the business) if there should be an ultimate deficiency, it should be borne *pro rata* by all the then creditors, Abraham Bell & Son included, so far as regarded their debt, outside of the twenty thousand dollars secured by bonds and mortgages. I think the understanding was that they were to advance funds to B. Brundred, Son & Co. for the purchase of materials. Mr. Brett said, business wanted driving and funds, and he had come there for both purposes. There was no understanding, however, that Bell & Son were to be liable, except upon their acceptances."

The said Hawley further testified, in relation to Brett's situation in the concern, as follows: "I considered him as partly our agent, and partly the agent of Bell & Son; so far as he made purchases and procured orders, he was our agent, and so far as overseeing and watching over the interest of A. Bell & Son he was their agent."

The said Hawley further testified, that the agreement of February 2, 1853, he believed covered all the property

of B. Brundred, Son & Co. not before mortgaged to A. Bell & Son, except the lease of the factory and real estate from B. Brundred to the firm, at a rent of two thousand dollars, which witness considered too high, and a license to use B. Brundred's before mentioned patent for making throstles, which they used in their manufacture, and which was of contingent value, according to the amount of business done.

It further appeared, that among the debts and liabilities of B. Brundred, Son & Co., paid during the transaction of the business under the agreement of February 2, 1853, were debts and liabilities of said firm incurred prior to that date, which were continued to be paid as they became due; no distinction being made between debts or liabilities incurred before, and those incurred after, said date.

The foregoing facts appearing by the evidence, the defendants applied for a nonsuit, on the ground that the defendants, Abraham Bell and James Bell, were not liable to the plaintiffs in this action, nor in connection with the other defendants; and if liable at all, were only liable in a court of equity.

But his honor the judge refused to grant a nonsuit, and charged the jury that, under and by virtue of the agreement of February 2, 1853, before mentioned, Abraham Bell and James Bell were liable for the debts incurred while the business was transacted in pursuance of said agreement, and were jointly liable therefore with the other defendants; and directed the jury to find a verdict for the plaintiffs for the amount of the note upon which the suit was brought; to which ruling and charge the defendants excepted.

Error having been assigned on this ruling of the judge, the case was argued in this court, by *Bradley*, for plaintiffs in error, and by *S. Tuttle* and *Zabriskie*, for defendants.

*Bradley*, for plaintiffs in error.

If Bell & Son were liable at all on this note, it was not jointly with the other defendants. The agreement did not make the two firms partners, either as between themselves or as to third persons. *Story on Part.* § 30 *to* 40, and cases cited.

*Tuttle* and *Zabriskie*, for defendants in error.

The defendants were made partners by the agreement 1 *Par. Con.* 124, 132, 134, 137; *Collyer on Part.* 67 ; 16. *Johns. R.* 34; 2 *Saund. R.* 87; 17 *Ves.* 404, *note p.* (*Sumner's ed.*); 3 *Man. G. & Scott* 54; *Story on Part.* 45, 55, 58 ; 18 *Wend.* 175; 3 *Kent's Com.* 23, 32; 1 *Smith's Lead. Cases* 491, *notes*; 4 *East* 411; 3 *Mees. & W.* 357; 1 *Hill* 526

The evidence shows there was a joint contract for the benefit of the defendants jointly.

*Bradley*, in reply.

The judge submitted no question upon the evidence to the jury ; he charged them explicitly that the agreement made the defendants partners, and therefore jointly liable. It is no question here what the facts would have warranted the jury to find. Unless the judge was right, as to the legal construction of the agreement, there was error in his ruling. They were not partners. The note on page 135 of 1 *Par. Con.*, as to the application of profits, if by that was meant, that a right to the profits, except as profits, that is depending upon the contingency of what the profits might turn out to be, would create a partnership, is not warranted by the cases cited. No case goes beyond a liability arising from a right to the profits, as such, that is where the party is to lose or gain in proportion to the profits. Bell & Son had no such right. No case has held that an assignment of profits in payment of a debt will make the assignee a partner. In such a case he has no other interest in the profits than all creditors have, that is a greater probability of being paid.

ELMER, J.  The judge of the Circuit Court having charged the jury that Abraham Bell & Son were liable, jointly with B. Brundred, Son & Co., for the debts contracted by the latter firm, in pursuance of the agreement entered into on the second day of February, 1853, and directed them to find a verdict for the plaintiffs; the propriety of that charge and direction depends upon the legal effect of the agreement.  If the effect was, as is now insisted, to make the members of the firm of Bell & Son joint partners with the members of the firm of B. Brundred, Son & Co. the charge was correct, it being undoubtedly a question of law, which it was the duty of the court to decide, whether the undisputed facts of the case did or did not make the parties legal partners.

No question of fact was submitted to the jury.  It was not alleged that A. Bell & Son were held out to the plaintiffs or to others as partners in the business of B. Brundred, Son & Co., and no question of their liability arising in that manner was raised.  The latter firm was engaged in the business of manufacturing machinery, at Oldham works, near Paterson, in this state, and the firm of A. Bell & Son was a commission house in the city of New York.  As such, they transacted the business of the manufacturers, disposed of their manufactured stock, collected their drafts and bills, and made them advances of money to enable them to carry on their business.  A large balance having become due to the commission merchants, mortgages were given, and an assignment of their tools made to them by B. Brundred, Son & Co., for their better security.  Afterwards the agreement in question was entered into, and the business carried on as before.  The lumber for which the note in suit was given, by the firm of B. Brundred, Son & Co., was ordered in the name of that firm, by one of the partners therein, and charged to them in the books of the plaintiffs.

There seems to be no reason to believe that A. Bell &

Son intended to become partners in the business of B. Brundred, Son & Co., and this was not much insisted on. But the argument relied on by the counsel of the defendants in error, the plaintiffs in the original suit, is that the effect of the agreement of February 2, 1853, was to entitle the firm of Bell & Son to participate in the subsequent profits made by B. Brundred, Son & Co. in their business, and thus to render them in law partners of that firm, at least so far as third parties were concerned. It cannot be doubted that, as the law is established, persons may become partners as to third parties, who are not partners as between themselves. This effect is produced wherever such persons become entitled to an actual participation in the profits of the business, as profits, and so that they are entitled to an account, and have a specific lien or a preference in payment over creditors, and thus have the full benefit of the profits of the business without any corresponding risk in case of loss. *Grace* v. *Smith*, 2 *W. Black.* 998; *Ex parte Hamper*, 17 *Ves.* 403; *Champion* v. *Bostwick*, 18 *Wend.* 184; *Denny* v. *Cabot*, 6 *Metc.* 82; *Barry* v. *Nesham and Lowthin*, 3 *Man. Gran. & Scott* 641; *Cushman* v. *Bailey*, 1 *Hill* 526. If however, the true construction of this agreement was, as is insisted, that it gives a right to Bell & Son to take all the profits of the business, after paying to the partners of the firm of B. Brundred, Son & Co. the sums stipulated in consideration of their services, I am not satisfied that it would have rendered them partners. They would not, upon that construction, take the profits, as such, that is, so that their gain would be more or less in proportion to the profits earned, but would take them simply as creditors, in payment of a prior debt. The profits, as such, would enure to the benefit of the firm of B. Brundred, Son & Co., after the agreement, as truly as they did before. Nor would those who had trusted the latter firm have any ground of complaint, because the debts incurred in carrying on the business would be first paid before profits would accrue.

But, in my opinion, it is a misapprehension of the agreement in question to consider it as transferring the profits of the business to Bell & Son. Nothing is said about profits, nor was their amount of any importance to Bell & Son, except that the greater they should prove to be, the less they might be called on to advance, and the more they would receive in discharge of their debt. Their interest in the profits was the interest of creditors, and not of participators, who were to gain or lose in proportion to what those profits should turn out to be. The agreement gives the entire management and control of the business of B. Brundred, Son & Co. to Bell & Son, with power to collect all moneys due to the first named firm, and to pay their indebtedness at their pleasure. The machinery on hand manufactured, in whole or in part, was stipulated to be delivered to Bell & Son, in payment of the prior indebtedness. Brundred, Son & Co. were not to contract any indebtedness without the written consent of Bell & Son, and the acting partners of the former were limited to draw only specified sums for the support of their families. The firm of Bell & Son were authorized to employ an agent to superintend the business under their direction, part of whose salary was paid by them, and part out of the business of B. Brundred, Son & Co. Power was also given to A. Bell & Son to discontinue the business after a period named, and to dispose of the stock and fixtures at auction.

This arrangement, it might perhaps be plausibly argued, was an assignment of the property and business to Bell & Son, and rendered them liable to account for it; or it may, perhaps, have constituted them the real principals in the business, carried on for their benefit in the name of B. Brundred, Son & Co., as their agents; but I can see no ground for holding them to be partners, and liable jointly with B. Brundred, Son & Co., for the debts contracted before or after the agreement. The business was carried on

after the agreement, precisely as it had been before. B. Brundred, Son & Co. acted as the manufacturers, and, as such, contracted debts in their own names and upon their own credit, while A. Bell & Son acted as commission merchants, collecting, receiving, and paying in that capacity. The old debts appear to have been treated like the new ones, and provided for, as occasion required, in the same way. Whatever, therefore, may have been the rights of the creditors of B. Brundred & Son, as against A. Bell & Son, either at law or in equity, as to which no opinion is meant to be intimated, I am clear that there was no partnership and no joint liability, as the legal effect of the agreement entered into between these parties, and that the judgment must be reversed.

The CHIEF JUSTICE, and Justices POTTS and VREDEN-BURGH concurred.

CITED *in Voorhees v. Jones,* 5 *Dutch.* 272; *Affirmed* 1 *Dutch.* 674.