## Case No. 5,031.

### In re FRANCIS et al.

[2 Sawy. 286; 7 N. B. R. 359; 5 Pac. Law Rep. 213; 4 Leg. Op. 493; 7 Alb. Law J. 13.] [1]

District Court, D. Oregon. Nov. 23, 1872.

John W. Whalley and Richard Williams, for petitioners.

W. W. Page and A. A. Northrup, for respondent.

DEADY, District Judge. On October 29, 1872, the firm of Walter Brothers filed their petition in this court, alleging that at and between the dates hereinafter mentioned, W. W. Francis and W. A. Buchanan were partners, doing business at Portland, under the name and style of "W. A. Buchanan," and praying that said "firm and its members" be adjudged bankrupts for the following causes:

I. That said firm, on September 10, 1871, made their promissory note, payable nine months after date, to the order of the petitioners, for $200, with interest at one per centum per month; and that on and after June 10, 1871, they fraudulently stopped payment of said note during a period of fourteen days.

II. That there is due the petitioners from said firm the sum of $500.29, the same being a balance of account for goods sold said firm between November 1, 1871, and October 1, 1872.

III. That on September 15, 1872, said firm being then insolvent, paid $250 to a creditor thereof, to wit: Field & Frie, of San Francisco, with the intent to thereby give a pref-

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission. 7 Alb. Law J. 13, contains only a partial report.]

erence to such creditor, and to defeat and delay the operation of the bankrupt act [of 1867 (14 Stat. 517)].

Buchanan made default, but on November 6, Francis answered, denying in effect that he was a partner with Buchanan in any of the alleged transactions or indebtedness. On November 12 and 13 the issue was tried by the court without a jury, and reserved for decision.

The following facts are admitted or satisfactorily proven:

I. That the matters stated in the petition, except as to the allegation of partnership between Francis and Buchanan are true.

II. That on January 24, 1871, Paul Richter and W. A. Buchanan were doing business as furniture dealers and upholsterers, under the firm name of Paul Richter & Co., and that on said day said firm made an agreement in writing with said Francis, to the effect following:

1. Francis agrees to advance said Richter & Co. the sum of $3,000 "in all before June, 1871, and to also keep the books of the firm for one year from said date," unless agreement terminated in the meantime.

2. Richter & Co. agree to pay Francis interest monthly at the rate of twelve per centum per annum upon said $3,000, and any further sum which he may advance to them, and also, "as remuneration for keeping the books of the firm, a sum equal to one sixth of the net profits of the firm which shall be made during the year 1871."

3. If Francis is absent from the city, a deduction in proportion to the length of such absence to be made from his remuneration.

4. Agreement may be terminated at the pleasure of either party, on giving the other notice in writing, in which case the amount then due Francis to "be repaid in notes of firm of $1,000 each," payable at intervals of sixty and thirty days after such notice, with interest at the rate of twelve per centum per annum; and if agreement terminated before end of year 1871, Francis to be paid as compensation for keeping books a fair sum, "not less than $45 per month."

III. On August 1, 1871, Richter retired from the firm, and said written agreement was modified by a verbal one, then made between B. and F., to the effect that the latter should receive one fourth of the net profits of the business for keeping the books, but not less than $25 per month, profits or no profits.

IV. For the five months ending December 31, 1871, Francis' share of the profits amounted to $389, $250 of which was added to the $3,000 due him, and a new note, payable on demand, taken by him for the amount, with interest at the rate aforesaid, signed W. A. Buchanan; but during the year 1872 the business made no profits.

V. Francis advanced the sum of $3,000, as per agreement, in January, 1871, and the $250 left in the business as aforesaid, and kept the books until September, 1872, during which time he loaned W. A. Buchanan, to be used in the business, from $2,000 to $2,500, on current account, which was secured by sufficient collaterals, and received from the business for all the money so advanced and loaned interest monthly at the rate aforesaid, and $25 per month.

VI. Francis was not known by the creditors of W. A. Buchanan to be a partner in the business, nor did he, during the time of his employment therein, volunteer any direction or advice in the conduct of it, except for a few weeks in 1872, while Buchanan was absent from the city, when he took into his custody the daily receipt of sales, and in some instances directed the salesman whom to credit and whom not; but during this time he had written authority from W. A. Buchanan to act as his agent, which authority, however was not exhibited to said salesman, or any one else, so far as appears, until it was produced on the trial.

VII. That Buchanan was adjudged a bankrupt, individually, on the petition of one of his creditors, in this court, on October 28 and that the liabilities incurred in the business, at the time of such adjudication, amounted to $13,000 or $14,000, and that Francis' claim against Buchanan for money loaned and advanced the business was, at that time, $5,200 or $5,300.

Upon this state of facts, counsel for the petitioners insist that, as to third persons, the law conclusively presumes that Francis was a partner in the firm of W. A. Buchanan, and therefore he is liable for its acts of bankruptcy and debts.

Under what circumstances a person not ostensibly a partner is nevertheless liable as one, is a vexed question. In the language of a distinguished commentator, "The cases on this subject are not easily reconciled, nor is the language used in relation to it always admissible, or indeed intelligible." T. Pars. Partn. p. 66. And again (Id. 92), "The many cases cited in the notes to this chapter exhibit in strong light the difficulty, if not impossibility, of drawing from the decisions any definite principle or rule applicable with certainty to the question, 'Who are partners as to third persons?'"

In Waugh v. Carver, 2 H. Bl. 235, cited as the leading case on this subject (1 Smith, Lead. Cas. 1289), Lord Chief Justice Eyre held that, while upon the facts, the Carvers and Geslier were not partners inter se, and did not intend to be, still they were such as to third persons, because, by the arrangement between them, they agreed "to take a moiety of the profits of each other's business generally, and indefinitely, as they should arise, at certain times agreed upon;" and upon the alleged authority of Grace v. Smith, 2 W. Bl. 998, he laid down the rule as follows: "He who takes a moiety of all the profits indefinitely, shall, by operation of law, be made liable to losses, if losses arise,

upon the principle that, by taking a part of the profits, he takes from the creditors a part of that fund which is the proper security to them for the payment of their debts." But in Grace v. Smith supra, Chief Justice De Grey says: "Every man who has a share of the profits of a trade, ought also to bear his share of the loss. And if any one takes part of the profits, he takes part of that fund upon which the creditor of the trader relies for his payment. * * * I think the true criterion is to inquire whether Smith agreed to share the profits with Robinson, or whether he only relied upon these profits as a fund of payment."

It will be observed that this latter case makes no distinction between sharing the profits definitely or indefinitely, the point for which it was cited in Waugh v. Carver, supra, but does make an entirely different distinction, that is, between sharing in the profits of a trade or relying upon them for payment, in both of which cases the degree of indefiniteness may be the same. Again, the reason given in the distinction taken in Grace v. Smith is not sufficient, because in point of fact, a person who shares in the profit of a trade, or receives such profits in payment, equally diminishes the fund on which the creditors rely.

In Ex parte Rowlandson, 1 Rose, 91, Lord Eldon said: "The ground was settled, that if a man as the reward for his labor chooses to stipulate for an interest in the profits in the business, instead of a sum proportionate to those profits, he is, as to third persons, a partner."

In Ex parte Hamper 17 Ves. 403, he said: "The cases have gone to this nicety, upon a distinction so thin, that I cannot state it as established, upon due consideration, that if a trader agrees to pay another person for his labor in the concern a sum of money, even in proportion to the profits, equal to a certain share, that will not make him a partner; but if he has a specific interest in the profits, themselves as profits, he is a partner. * * * It is clearly settled, though I regret it, that if a man stipulates that as the reward of his labor, he shall have not a specific interest in the business, but a given sum of money, even in proportion to a given quantum of the profits, that will not make him a partner, but if he agrees for a part of the profits, as such, giving him a right to an account, though having no property in the capital, he is, as to third persons, a partner."

These dicta of Lord Eldon's have been very much deferred to by the courts and the profession. Parsons says: "We have reason to believe that for many years, in various parts of this country, numerous contracts of this kind have been drawn, carefully using the language which Eldon is supposed to have made safe by the distinction he asserted. Nor is it difficult to account for this. For, to say nothing of the immense authority of so eminent a judge, his words so understood, supply a clear, simple, and easily applicable rule for the avoidance of a great danger. They tell the lawyer who would draw a contract of this kind, how, by a mere formula, he can guard his clients from a great uncertainty; the inconvenience of which might otherwise suffice to prevent the proposed arrangement. As a convenient rule, much may be said of it; but as an accurate one, it must be spoken of very differently.

"It is indeed remarkable that a rule, or a distinction, to which Lord Eldon strongly objects, not merely 'doubting,' but positively affirming his dislike, and which he lays down, as he says, under the constraint of irresistible authority, should since have been generally adopted, not so much on his authority as on his assertion of preceding authority, when in point of fact no such authority can be found, or, so far as any accessible evidence goes, can now be believed to have existed."

The criterion for determining whether the agreement makes a case of compensation or partnership as to third persons, differs in these cases (Ex parte Rowlandson and Ex parte Hamper) from the one asserted in Waugh v. Carver, that he who participates in the profits of a trade, indefinitely, is liable as a partner, because he takes from the fund upon which the creditors rely; and the only reason given for the distinction between the liability of the person who contracts to take a sum equal to a share of the profits of a trade, and one who stipulates for a share of such profits, as profits, is, that the latter has a right to an account, and therefore he is liable as a partner. And this reason has been since asserted and relied on by courts and writers. 3 Kent, Comm. 25, note b; Champion v. Bostwick, 18 Wend. 184; Heinstreet v. Howland, 5 Denio, 68; Denny v. Cabot, 6 Metc. [Mass.] 92.

In reference to these, Bisset on Partnership, 14, says: "Some of the writers, and even some of the judicial authorities, on this subject appear to think they have surmounted the difficulty, by confining the rule of liability to the cases where the party would have a right to an account of the profits; but to this it may be answered, that in all cases where a person is to be paid for his services by a sum proportioned to the profits, he must be entitled to an account of the profits. If not, how is he to ascertain that he has what he has stipulated for? * * * The distinction between the cases where a participation in the profits has been held to make a man liable as a partner, and those where it has been held not to make him so liable, is certainly, at least as Lord Eldon has given expression to that distinction, so thin, that it does not appear possible, from the most careful consideration of it, to arrive at any clear, general conclusion; nor does Mr. Justice Story's attempt to reconcile the repugnancy of the various decided cases, and to bring them, as he says, 'into harmony with

each other, as well as with common sense,' appear to be very successful. If the matter were res integra, a plain and intelligible rule, and one, too, which would not be at variance with anything in the cases decided previously to Ex parte Hamper, 17 Ves. 403, would be, that those whose share of the returns of the business or adventure consisted wholly of the profits of the stock, or partly of the profits of the stock, and partly of the wages of labor, should be held liable as partners; but those whose share of the said returns consisted wholly of the wages of labor, or the interest of money lent, or a certain fixed annuity, and who had no control or voice as principals in the management of the business or adventure, should not be held liable as partners."

In discussing this supposed test of liability as a partner—the right to an account of the profits of the business—T. Parsons on Partnership, p. 92, says: "Undoubtedly every partner has a right to an account of the profits; but the converse is not true, that every one who has such a right is a partner. There are many ways in which a man may represent another, and in that right be entitled to an account, without being liable as a partner."

Hickman v. Cox, 91 E. C. L. 523, is a comparatively late English case, 1860, in which the rules given in the cases above cited seem to have been treated as erroneous or unintelligible. The case was this:

Smith and Son, prior to 1850, carried on business at the Stanton Iron Works, as ironmasters and merchants, and being involved and indebted to the defendants and others, executed a composition deed transferring their property and business to certain trustees, in trust, that they would carry on the business in the name of the Stanton Iron Co., and after paying expenses and interest on a certain mortgage whenever and as often as the net income amounted to a shilling on the pound of the indebtedness, to divide the same among the creditors in proportion to their claims, and when these were discharged to reconvey the property to Smith and Son. The deed was executed by the trustees and creditors, who thereby released the debtors. In 1855, the plaintiff, who was the proprietor of the Grafton Iron Ore Works, drew three bills for upwards of 1,300 pounds, for ore furnished the Stanton Iron Co., which were accepted by James Haywood, one of the trustees, "per procuration, the Stanton Iron Co." Afterwards the works passed into the hands of the mortgagee, and ceased to be carried on under the composition deed, when the plaintiff brought suit against the defendants as acceptors of the bills, on the ground that the creditors under the deed were partners in the business of the Stanton Iron Co., because the same was conducted by their agents, the trustees, and they had stipulated to take the profits therof.

At Trinity term, 1856, the plaintiff had judg-ment in the court of common pleas, the court holding on the authority of Owen v. Body, 5 Adol. & El. 28, and Janes v. Whitbread, 11 C. B. 406, that the creditors executing this deed became partners in the trade agreed to be carried on thereunder. On appeal the case was argued in the exchequer chamber in February, 1857, and judgment reserved until November, when the judgment of the common pleas was affirmed—three judges for and three against. On appeal to the house of lords, the decision was reversed (99 E. C. L. 47). The six judges who heard the argument in the house of lords, delivered opinions seriatim, and were equally divided on the question, "are the defendants liable upon the bills of exchange?"

The lord chancellor, Campbell, and the law lords, Brougham, Cranworth, Wensleydale and Chelmsford, delivered opinions to the effect that the defendants were not partners.

In the course of the opinions delivered, the supposed rule that participation in the profits of a trading concern makes one liable as a partner, was questioned and commented upon freely. Blackburn, J., who was for holding the defendants as partners, said: "The phrase taking the profits as such, is not a happy one; and there is some difficulty at times in defining what it means; but I think, at all events, it means this: It is not possible, according to the common law, to cause a trading concern to be carried on upon the terms that the advantages of a partnership, including the participation in profits and partnership lien and security over the assets of the firm, shall belong to those who have but a limited liability."

Whightman, J., who was for reversal, said: "It is said that a person who shares in net profits is a partner. That may be so in some cases, but not in all; and it may be material to consider in what sense the words 'sharing in the profits' are used. In the present case, I greatly doubt whether the creditor who merely obtains payment of a debt incurred in the business, by being paid the exact amount of his debt, and no more, out of the profits of the business, can be said to share the profits."

Pollock, C. B., who was of the same mind, said: "The question then arises, whether the interest which the creditors had in the profits to be made by the carrying on of the business under the deed, was such as to make them partners in respect to third persons. * * * If a firm were in difficulties, and a person proposed to assist them by a loan of money, engaging to receive payment out of the profits only, and to make no claim in the event of there being no profits, but stipulating that one half of the profits should be applied as they arose in payment of his debt, and that he should have power to see that this was done—would he thereby become a partner, and liable for all debts contracted subsequently to this arrangement? On this very simple state of

facts, there may possibly arise a difference of opinion; but I think a large majority of all lawyers and commercial men would decide at once that assistance so offered and so accepted, would not make the lender of the money a partner as to third persons. If he took a warrant of attorney, entitling him to enter up judgment at his pleasure, and sweep away in payment of his demand, capital, debts, profits and everything, he certainly would not be a partner; but as is said, if he limits his claim to be paid out of the profits only, his limited right to payment creates an unlimited liability. I think, my lords, there must be some fallacy in this; the conclusion, to my mind, appears so unjust and absurd, and so much at variance with natural equity."

Lord Cranworth said: "Would they (the creditors) have become partners in the concern carried on by the trustees merely because they passively assented to its being carried on upon the terms that the net income, i. e., the net profits, should be applied on discharge of their demands? I think not. It was argued that, as they would be interested in the profits, therefore they would be partners. But this is a fallacy. It is often said that the test, or one of the tests, whether a person, not ostensibly a partner, is nevertheless, in contemplation of law, a partner, is whether he is entitled to participate in the profits. This, no doubt, is in general a sufficiently accurate test; for a right to participate in the profits affords cogent, often conclusive evidence that the trade in which the profits have been made, was carried on in part for or on behalf of the person setting up such a claim. But the real ground of the liability is, that the trade has been carried on by persons acting on his behalf. When that is the case, he is liable to the trade obligations, and entitled to its profits, or to a share of them. It is not strictly correct to say that his right to share the profits makes him liable to the debts of the trade. The correct mode of stating the proposition is, to say that the same thing that entitles him to the one, makes him liable to the other, namely, the fact that the trade has been carried on in his behalf, i. e., that he stood in the relation of principal towards the persons acting ostensibly as the traders, by whom the liabilities have been incurred, and under whose management the profits have been made."

Lord Wensleydale said: "A man who orders another to carry on a trade, whether in his own name or not, to buy and sell, and to pay over all the profits to him, is undoubtedly the principal, and the person so employed is the agent; and the principal is liable for the agent's contracts in the course of his employment. So, if two or more agree that they should carry on a trade and share the profits of it, each is a principal, and each is an agent for the other, and each is bound by the other's contracts in carrying on the trade as much as a single principal would be by the act of an agent who was to give the whole of his profits to his employer. Hence, it becomes a test of the liability of one for the contracts of another, that he is to recover the whole or a part of the profits arising from that contract, by virtue of the agreement made at the time of the employment. I believe this is the true principle of partnership liability. Perhaps the maxim, that he who takes the profits ought to bear the loss, often stated in the earlier cases on this subject—Waugh v. Carver [supra]—is only the consequence, not the cause, why a man is liable as a partner."

From the general conclusion reached in this case, that the defendants were not partners in the Stanton Iron Co., simply because they were to receive the net profits of the business, and from the opinion expressed in the H. of L., I think it is clear that the decision set aside the arbitrary rule, that indefinite or other participation in profits necessarily made one liable as a partner under any circumstances, but the fact of such participation is to be treated as evidence, more or less cogent, according to the circumstances, of a partnership.

Following the final decision in Hickman v. Cox, supra, and in consonance with the views therein expressed, the English parliament recently passed an act (28 & 29 Vict. c. 86), which provides, among other things, that a loan to a person engaged in trade, upon a written contract, that the lender shall receive a rate of interest in proportion to profits, or a share of the profits, shall not of itself constitute the lender a partner; nor shall a contract to remunerate a servant or agent of a person engaged in trade by a share of the profits, of itself render such servant or agent liable as a partner. In noticing this act, T. Parsons on Partnership, p. 93, says:

"We will add our hope and our belief that the courts of this country will regard this statute rather as declaratory of the law-merchant in respect to partnership, than as changing that law, and will apply to cases which come before them the principles upon which the statute is founded."

The American cases on this subject are also conflicting, but the weight and tendency of authority appears to be in favor of the doctrine "that a mere promise to pay out of the profits a sum of money, as a specific proportion of the profits, does not necessarily constitute the payee a partner, and gives him no interest in the profits, and no right to the profits, but only a personal claim against the promisor for such money, or for such a share of profits, after they are ascertained and may be divided." T. Pars. Partn. p. 70. In Berthold v. Goldsmith, 24 How. [65 U. S.] 542. Mr. Justice Clifford, speaking for the court, says: "Actual participation in the profits as principal, we think, creates a partnership as between the parties and third

persons, whatever may be their intentions in that behalf, and notwithstanding the dormant partner was not expected to participate in the loss beyond the amount of the profits."

In support of this proposition, the cases of Waugh v. Carver and Grace v. Smith, supra, are cited, together with the rule announced therein; that he who has a share of the profits ought to bear his share of the loss. But the opinion goes on to say: "That rule, however, has no application whatever to a case of special service or agency, when the employé has no power as a partner in the firm, and no interest in the profits, as property, but is simply employed as a servant or special agent, and is to receive a given sum out of the profits, or a proportion of the same, as a compensation for his services." In other words, the participation in the profits which will make one liable to third persons as a partner, is a participation as a partner, or, in the language of the opinion, as principal—and that is the fact to be ascertained. In that case, the court held that a person who negotiated the sale of goods for another, under a contract to have half the profits and a certain compensation in any event, was not a partner as to such sales.

Mr. Justice Story believes that the true doctrine upon this subject is, that a participation in the profits is presumptive proof that the participant is a partner, and sufficient proof in the absence of all other opposing circumstances. Story, Partn. § 38.

Having reached this conclusion, I cannot, upon the facts so far stated, conclude that Francis is liable as a partner with Buchanan. For although he participated in the profits of the trade, the agreement and circumstances under which such participation took place are sufficient to modify the presumption of law that he did so as a partner or principal, and so leave it in doubt whether he took such profits only as a compensation for money loaned and services rendered, or otherwise.

It then becomes necessary to inquire further and ascertain whether, upon the whole evidence, Francis was in fact a partner or not.

Buchanan being called as a witness by the petitioners, testified that Francis was an actual partner in the firm of Richter & Co., and also in that of W. A. Buchanan, so far as the profits were concerned, but not in the losses, and that the written and verbal agreement aforesaid, and the manner of keeping the books, and the written authority to Francis to act as his agent, by which it appeared that Francis only loaned money to Richter & Co. and to W. A. Buchanan, for a certain interest, and kept their books for a share of the profits with a guarantee of a certain sum per month, were all a mere pretense and device, not intended to wrong any one engaged in business with said firms, but merely to conceal the fact of such partnership from Francis' employer, the Bank of British Columbia, it being contrary to the rules of such

bank that their employés should be engaged in other business.

Francis being called as a witness on his own behalf, testified that he was not a partner in the concern, unless the agreement made him one, that it truly stated his relations to the parties and the business, and that he desired such relations to be kept secret, but did not state why. He also admitted that he was a clerk in the bank aforesaid, during the period covered by these transactions.

Paul Richter, called as a witness by the petitioners, testified that it was his understanding that Francis was a partner in the firm of Richter & Co., but he had no direct knowledge on the subject.

Dr. Cardwell, called by the petitioners, testified that after Buchanan was adjudged a bankrupt, Francis urged him to agree to a settlement for fifty cents on the dollar, and he then said that if witness would so settle he would never hear of a $600 note made by witness as an accommodation to B., and which Francis then held as collateral security for money loaned B. on account, and that B. considered their debts confidential, and would pay them dollar for dollar.

Here is a direct conflict between the testimony of the two persons who ought to know better than any one else what was the real relation between them concerning this business. Resort must, then, be had to the circumstances and other proofs of the case to ascertain the truth of the matter. Buchanan, so far as can be seen, has no pecuniary interest in the question. Francis has a large one. Buchanan may have some personal feeling against Francis, regarding him as one who, in the language of counsel, has sucked the sap out of the business; or, as the leonine partner in what the Roman lawyers called societas leonina, in allusion to the fable of the lion—who, having entered into a hunting partnership with the other beasts of the forest, appropriated to himself all the prey. Be this as it may, he did not impress me as a witness who was inimical in his feelings towards Francis. He stated that he did not first disclose the fact of partnership. His testimony was direct and positive, and went into details of conversations between himself and Francis, with the circumstances of time and place, that gave it the semblance of probability and truth. On the contrary, Francis' testimony was brief, somewhat ambiguous—as that he was not a partner unless his agreement made him one—and consisted mainly of general denials.

Again, the fact of Francis' employment in the bank furnishes a motive, reason or inducement to disguise a partnership with this cloak of a loan of money and hiring of services.

The interest which Francis took in having the creditors settle at fifty cents on the dollar may have been prompted by mere friendship for Buchanan, but the fact that he

assured Cardwell that in such event his debt would be paid in full, or he would never hear of his note again, indicates a concern, knowledge and authority in the premises that we might expect of a person interested in the matter otherwise than as a mere creditor.

When Francis exercised the direct authority in the business that he did in the absence of Buchanan, although he had a secret writing appointing him agent, he did not deem it necessary to show it to the salesman or any one else, but proceeded to take the cash into his own custody from the till, daily, and direct who to credit and who not, with all the authority of a partner. The salesman, Mr. Lewis, don't seem to have had any question or doubt about his right to do so, independent of the writing, which he never saw or knew of, until it was produced in court.

Richter's testimony goes to establish the partnership. The particulars of the transaction don't appear to have been disclosed to him by either B. or F. But from all that he observed during the six or seven months that he was an active partner in the concern he regarded and treated Francis as a partner in the profits at least, although not in the capital stock. As to what B. told Richter, I do not consider it, because B.'s declarations upon the question of the existence of the partnership are not evidence against Francis.

It does not directly appear from the evidence what was a reasonable compensation for keeping the books. It was assumed by counsel for the petitioners, and not questioned by opposing counsel, that twenty-five dollars per month was a fair compensation, and the conclusion appears probable. Now, if Francis was simply employed to keep books, what inducement was there for Buchanan to agree to give him any interest in the profits of the business, or any other compensation beyond the twenty-five dollars per month, which he was guaranteed and paid, profits or no profits? The money put into the concern, if a loan, was drawing the highest legal rate of interest, independent of the compensation paid as bookkeeper.

This single circumstance indicates that this arrangement was either a device to cover up a partnership in the profits or a usurious loan. As it is not unlawful to be a dormant or secret partner in a trading business, and it is to loan money at usurious interest, the court ought to infer that the contingent and extra compensation for keeping the books was a device whereby Francis was to be admitted to a share in the profits as a partner.

All these circumstances considered, I think the weight of the testimony is in favor of the conclusion that Francis was a partner in the firm of W. A. Buchanan. But if, as contended by counsel for respondent, the evidence was evenly balanced, effect being given to the fact that Francis did participate in the profits, the same conclusion would follow.

As has been shown, a participation in the profits, in fact, is presumptive proof of partnership, and sufficient proof, unless overcome by other circumstances. Story, Partn. § 38. It being admitted that Francis participated in the profits of the concern, and the circumstances of the agreement at least, leaving it in doubt whether such participation was as partner or employé, the burden of proof is upon him to overcome the presumption that such profits were received by him as a partner.